Joseph A. WEISS, Plaintiff-Appellant,

v.

Emerich HUNNA, Defendant-Appellee.

No. 127, Docket 27749.

United States Court of Appeals
Second Circuit.

Argued Nov. 16, 1962.

Decided Jan. 10, 1963.

Joseph A. Weiss, pro se.

Frank G. Wittenberg, New York City, Katz, Wittenberg & Katz, New York City, for appellee.

Before SWAN, WATERMAN and FRIENDLY, Circuit Judge.

FRIENDLY, Circuit Judge.

Plaintiff, a citizen and resident of New York, acting *pro se,* appeals from a judgment of the District Court for the Southern District of New York entered March 16, 1962, on an opinion by Judge Bonsal. The judgment dismissed the complaint in a tort action against defendant, an Austrian citizen and leading member of the Vienna bar, which had been tried to the court without a jury. Plaintiff appeals also from an order dated August 6, 1962, in which Judge Bonsal, in a memorandum, denied his motion to set the judgment aside on the ground that, under 28 U.S.C. § 455, the judge should have disqualified himself from trying the case.

Review of the August 6 order encounters an obstacle of which we must take note although neither party has raised it here. Plaintiff's motion to vacate the judgment on the ground of disqualification was made on July 23, 1962, more than four months after the judgment had been entered and over three months after the plaintiff, on April 10, had filed a notice of appeal. Although defendant argues here that the motion was not timely because not made within the ten-day period set by F.R. Civ.Proc. 59(b) for a motion for a new trial, we will assume that it could properly have been entertained after that period as a motion under Rule 60 (b) based on "newly discovered evidence" or on "any other reason justifying relief from the operation of the judgment." See Sternstein v. "Italia", 275 F.2d 502 (2 Cir.1960); 6 Moore, Federal Practice (2d ed. 1953), at 3719. But once plaintiff had filed a notice of appeal, the district court was divested of jurisdiction to grant or deny relief under either Rule 59 or Rule 60(b) except with our permission. Freedman v. Overseas Scientific Corp., 150 F.Supp. 394 (S.D.N.Y.1957); Ritter v. Hilo Varnish Corp., 186 F.Supp. 625 (S.D.N.Y. 1960); Daniels v. Goldberg, 8 F.R.D. 580 (S.D.N.Y.1948), aff'd, 173 F.2d 911 (2 Cir.1949); 7 Moore, Federal Practice (2d ed. 1953), at 335–338. We therefore cannot recognize the August 6 order as validly entered and appealed from; rather we shall treat the appeal as a motion asking us to remand so that the district judge may rule on the issue of disqualification. See Zig Zag Spring Co. v. Comfort Spring Corp., 200 F.2d 901, 907–908 (3 Cir.1953); Baruch v. Beech

**714**

Aircraft Corp., 172 F.2d 445 (10 Cir. 1949).

■■ So treating it, we deny the motion. The statute, 28 U.S.C. § 455, directs that "any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein." As stated in MacNeil Bros. Co. v. Cohen, 264 F.2d 186, 189 (1 Cir.1959), disqualification for being "so related or connected" is generally "a matter confided to the conscience of the particular judge." Plaintiff's lengthy presentation on this subject, when stripped of its intemperate accusations and inapposite references to Judge Bonsal's testimony before the Senate Judiciary Committee, boils down to the fact of the judge's common membership with defendant in certain international legal associations and attendance at one or more of their meetings. Although the order of August 6 was not legally effective as such, we may take note of the judge's memorandum as indicating that "in his opinion" it was in no way improper for him to sit. We endorse his view. Quite apart from his statement that he does not know the defendant, professional relationships of this sort do not reach the level where considerations of disqualification arise.

The judge's task in ruling on the merits was rendered difficult, as ours has been, by the diffuse and extreme character of plaintiff's presentation. Stated as briefly as we can and to the best of our understanding, the background of the case is this: Plaintiff's family originally consisted of his father, Leo Weiss; his mother, Karoline; and two brothers, Leopold and Richard. At the time of the Nazi take-over of Austria in 1938, Leo and Leopold owned respectively 232 and 40 shares, and one Karol Broda owned 272 shares, of stock in the Estermann Company, an Austrian manufacturer of soap and oleomargarine; this total of 544 shares, constituting 54.5% of the outstanding stock, gave control by virtue of a "syndicate agreement" among the three. After fleeing Austria and before his death in 1942, Leo turned over his 232 Estermann shares to plaintiff. The effect of this transfer is disputed. Plaintiff contends that while Leo wanted the surviving members of the family to benefit equally from the shares after the war, he intended to make plaintiff "sole legal owner" for the purpose of re-establishing family control of the corporation through the syndicate; defendant, on the other hand, claims that Leo intended plaintiff to serve merely as a conduit for distribution of the shares to the surviving members of the family after the war, and that consequently Karoline, Richard, and Leopold each had an unconditional right to receive from plaintiff one-fourth, or 58, of the shares. It is not clear which of these opposing contentions was accepted by the judge; he found that Leo "wanted the plaintiff to re-establish the pre-war syndicate with Broda so as to regain control of Estermann," but also that "the most plausible inference from the evidence is that plaintiff's mother and his brothers would each have an equitable interest in these shares." In any event, plaintiff after the war obtained restitution from the Austrian authorities of the 232 shares, and also of the 40 shares belonging to his brother Leopold. He then sought, by re-establishing a syndicate with Broda (who, like plaintiff, had become a resident of the United States), to reassert control of the corporation as against certain Austrian stockholders. This effort ultimately proved unsuccessful—primarily, it appears, because of the opposition of plaintiff's brother Richard, who was allied with the Austrian stockholders and who had succeeded in obtaining possession of the 58 shares of Weiss-family stock to which he deemed himself entitled by virtue of the transfer from Leo to plaintiff. The bad feeling between plaintiff and Richard also took the form of a struggle for influence over Karoline and for Leopold's estate after the latter's death in the United States early in 1953.

(The latter contest was won by plaintiff when Leopold's will, effectively disinheriting Richard and leaving everything to plaintiff, survived attack in the New York courts.)

Meanwhile, and more directly pertinent to plaintiff's contention here, several suits were brought against plaintiff in Vienna over the right to the family's Estermann shares. On January 29, 1953, an attorney named Strauss, purporting to be authorized by Karoline and claiming that plaintiff was about to sell the shares, obtained a temporary injunction restraining plaintiff from selling the 58 shares alleged to belong to Karoline. On March 6, 1953, Strauss followed this up by filing, again on Karoline's behalf, a complaint against plaintiff seeking actual delivery of the 58 shares. On May 30, 1953, Karoline died; but the judge found that under Austrian law her death did not terminate Strauss' authority to act for her. On June 2, 1953, Strauss substituted the defendant Hunna for himself as "Karoline's" attorney in the March 6 action, a substitution which the judge found valid under Austrian law.

Nothing further of significance had taken place in the March 6 action when, on November 7, 1953, plaintiff made in New York a contract with Broda, also a resident of New York, whereby plaintiff agreed to sell and deliver to Broda 217 shares of Estermann stock (the 232 received from his father, minus the 58 taken by Richard, plus the 40 inherited from Leopold, plus three others that plaintiff had purchased). The contract does not state where the shares were to be delivered, but payment was to be made "in New York, in U. S. Dollars", and the instrument recited that it was subject to the law of New York. In regard to price, the agreement provided that if plaintiff delivered all 217 shares within one year, Broda would pay the price quoted for Estermann shares on the Vienna stock exchange on a specified day; if plaintiff did not deliver all 217 shares before November 7, 1954, Broda was obligated to pay only such price as he himself should subsequently obtain on a sale of his own Estermann shares together with those purchased from plaintiff. On January 31, 1954, the temporary injunction obtained by Strauss expired, and plaintiff then transferred the 58 released shares to Broda's account. But on May 20, 1954, the defendant went into court in Vienna and, as part of the action brought in Karoline's name on March 6, 1953, obtained a second temporary injunction blocking plaintiff's transfer of 58 shares; since plaintiff had in fact already transferred the particular shares blocked by the earlier injunction, this decree was directed against 58 *other* shares that allegedly were Leopold's and that had been independently tied up by a "stay of delivery" against plaintiff in an Austrian action brought in the name of Leopold's estate before the New York court sustained plaintiff's claim as Leopold's legatee. Despite efforts by plaintiff to have this temporary injunction of May 20, 1954, lifted, it remained in effect through November 7 of that year—the deadline prescribed in plaintiff's contract with Broda.

Negotiations then took place between Broda, an elderly man who apparently had become weary of the controversy, and the Austrian stockholders in control of Estermann, who were clients of defendant. These led to a contract, made in New York, whereby the Austrian interests represented by defendant agreed to purchase from Broda both the shares Broda had long owned and the 217 acquired from the plaintiff. Since the injunction of May 20, 1954, remained an obstacle to the consummation of this agreement, defendant on April 2, 1955, returned to the Austrian court, purportedly on behalf of Karoline, and renounced her claim to the shares, withdrew her complaint against plaintiff, and moved to vacate the injunction, thereby clearing the way for the delivery of all of the 217 shares by plaintiff to Broda and by Broda to defendant's other clients. The price which the Austrian interests paid for the shares, and which plaintiff accordingly received from Broda, was

allegedly $135,318 less than what would have been payable by Broda if plaintiff had been able to make delivery by November 7, 1954; it is this amount that plaintiff seeks as damages here.

■■ Much of plaintiff's case was a challenge to the legal authority of defendant and his predecessor, Strauss, to institute the Austrian litigation and to continue it after Karoline's death. See Bond v. Chapin, 8 Metc. 31, 49 Mass. 31 (1844). If that were the only basis on which plaintiff could prevail, we would not disturb the judgment of dismissal; for plaintiff himself acknowledged that Karoline had some interest in the shares, there was documentary evidence that she had authorized Strauss to institute the litigation, and the findings as to the continuation of authority after her death and as to the validity of the substitution of attorneys were reasonable readings of Austrian law. But the very zeal of plaintiff's pursuit of this point seems to have distracted the judge's attention from another legal theory which, although not developed by plaintiff's counsel at the trial as explicitly as it should have been, was sufficiently presented by the pleadings and the evidence to warrant recovery if sustained in plaintiff's favor on all the facts. See F.R.Civ.Proc. 54 (c). This theory was that in prosecuting the Austrian litigation defendant and his predecessor, even though possessing a valid power of attorney, were acting not in a *bona fide* effort to protect the interests of Karoline and later of her estate, but rather, at least after November, 1953, in the interests of their other clients, for the purpose of preventing plaintiff from delivering the shares to Broda before the contractual deadline and of thereby causing Broda to sell his own shares, as well as those purchased by him from plaintiff, to these other clients at a much lower price, thus assuring them of continued control of the corporation. If plaintiff could prove this, and that such conduct by defendant had damaged him, he would have established what constitutes the tort of abuse of process under the law of most American states, including New York. See American Law Institute, Restatement of Torts, § 682; 1 Harper & James, Torts, § 4.9 (1956); Prosser, Torts, § 100 (2d ed. 1955); Hauser v. Bartow, 273 N.Y. 370, 7 N.E.2d 268 (1937); Rothbard v. Ringler, 77 N.Y.S.2d 351 (Sup.Ct. 1947); Lader v. Benkowitz, 188 Misc. 906, 66 N.Y.S.2d 713 (Sup.Ct.1946); Station Associates, Inc. v. Long Island R. R., 18 Misc.2d 1092, 188 N.Y.S.2d 435 (Sup.Ct.1959).[1]

■ On this view of the nature of the claim, the choice of law problem that disturbed the judge is also altered. In actions for the related tort of malicious prosecution, either criminal or civil, where the gist of the wrong is the initiation of an unjustifiable legal proceeding and probable cause is a defense, the issue whether or not there was probable cause must be determined in the light of the "substantive" law, criminal or civil, that governed the former proceeding in

---

1. Maintenance of a claim for the closely related tort of "malicious prosecution," or "wrongful initiation of civil proceedings," would probably be precluded by the fact that the Austrian injunction proceedings, which were contested by the plaintiff, did not terminate in his favor. See Hauser v. Bartow, 273 N.Y. 370, 375–77, 7 N.E. 2d 268, 270–271 (1937); Bronstein v. Dayton Peninsula Corp., 11 A.D.2d 1036, 206 N.Y.S.2d 12 (2d Dept. 1960); American Law Institute, Restatement of Torts, § 675, comment b (1938); 1 Harper & James, Torts, at 328 (1956); Prosser, Torts, at 664–65 (2d ed. 1955). This might not be true, however, if plaintiff could prove his post-trial allegation that some of the documents relied on by the defendant and his predecessor in the Austrian proceedings were forged or otherwise fraudulent, see Johnson v. Girdwood, 7 Misc. 651, 28 N.Y.S. 151, aff'd, 143 N.Y. 660, 39 N.E. 21 (1894), Goldner-Siegel Corp. v. Kraemer Hosiery Co., 153 Misc. 159, 274 N.Y.S. 681 (Sup.Ct. 1934), or if the manner in which the proceedings terminated had a less conclusive effect under Austrian law than under New York law. See International Film Distribution Establishment v. Paramount Pictures Corp., 14 Misc.2d 203, 155 N.Y.S. 2d 767 (Sup.Ct.1956).

the state where it was brought.[2] Indeed, lower court decisions indicate that New York will enforce a claim for malicious prosecution only if, and to the extent that, one is recognized by the law of the place where the former action was prosecuted, Sims v. Union News Co., 284 App. Div. 335, 131 N.Y.S.2d 837 (1st Dept. 1954); International Film Distribution Establishment v. Paramount Pictures Corp., 14 Misc.2d 203, 155 N.Y.S.2d 767 (Sup.Ct.1956); Pelella v. Pelella, 13 Misc.2d 260, 176 N.Y.S.2d 862 (Sup.Ct. Kings County, 1958), aff'd 9 A.D.2d 897, 195 N.Y.S.2d 599 (2d Dept.1959), although in none of these cases was the issue sharply presented, see Ehrenzweig, Conflict of Laws, at 558 (1962). But on the theory of the tort we are now considering, it is irrelevant that the injunction suits may have stated a claim reasonable or even valid under Austrian law, or that Austria may not recognize a cause of action for the wrongful initiation of civil proceedings. For "the gist of the tort" of abuse of process, as distinguished from malicious prosecution, "is not commencing an action or causing process to issue without justification, but misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance." Prosser, Torts, at 667–668 (2d

ed. 1955). See also 1 Harper & James, Torts, at 330 (1956); American Law Institute, Restatement of Torts, § 682, comment a. Here the alleged purpose of the process was to frustrate a contract made in New York between residents of New York; the resulting sale by Broda of his own and plaintiff's shares was stated to be "a transaction entered into and carried out in New York"; and the harm—the diminution of the price of the shares—was suffered in New York, where Broda ultimately paid the lower price. The Austrian legal process, allegedly, was simply the means employed to effectuate these ends. Under such circumstances we do not believe that New York would refuse to recognize a claim for abuse of process that it would have recognized if the proceedings had taken place in its own courts,[3] see Ehrenzweig, Conflict of Laws, at 558, 563 (1962), at least in the absence of proof that Austria had not merely declined to recognize abuse of process as a delict, but had conferred upon attorneys in Austrian legal proceedings something akin to the absolute official privilege recognized for public officers at common law, see Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). We are not required at this juncture to determine what New York would say if that were proved, for we do not construe the judge's reference to the Austrian Statute Regulating

2. For a similar reason the judge was correct in looking to Austrian law to determine whether authority conferred by Karoline continued after her death, and whether the authority permitted Strauss to substitute Hunna.

3. It is thus inconsequential that if plaintiff had been required to rely on Austrian law, it may be that the complaint could have been properly dismissed, since (1) plaintiff introduced no evidence to show that defendant's conduct was tortious under Austrian law, (2) the tort of wrongful use of process may not involve such elementary principles that New York courts would simply assume it to be recognized in a country not following the common law, see Cuba R. R. v. Crosby, 222 U.S. 473, 32 S.Ct. 132, 56 L.Ed. 274 (1912); Riley v. Pierce Oil Corp., 245 N.Y. 152, 156 N.E.

647 (1927); Industrial Export & Import Corp. v. Hongkong & Shanghai Banking Corp., 302 N.Y. 342, 349–350, 98 N.E.2d 466, 469–470 (1951); International Film Distribution Establishment v. Paramount Pictures Corp., supra, and (3) New York might regard it as an abuse of discretion to utilize the judicial notice statute, New York Civil Practice Act, § 344–a, to take notice of a civil law system when the party having the burden has not adequately assisted the court in learning of it, Sonnesen v. Panama Transport Co., 298 N.Y. 262, 82 N.E.2d 569 (1948); Walton v. Arabian American Oil Co., 233 F.2d 541, 544 (2 Cir.), cert. denied, 352 U.S. 872, 77 S.Ct. 97, 1 L.Ed.2d 77 (1956); see International Film Distribution Establishment v. Paramount Pictures Corp., supra.

Attorneys-at-Law, § 9(1), July 31, 1945, Gazette #103, as a finding that Austria has gone so far.[4]

In view of the judge's permissible finding that defendant and his predecessor had authority to proceed in Austria on behalf of a client claiming an interest in the shares, plaintiff's burden of showing that the suits were not for a legitimate purpose was a heavy one. The judge could properly have concluded that it was not discharged, save for one episode which seems to us sufficiently probative to demand explanation. This was defendant's action, described above, in returning to the Austrian court after his other clients had concluded their contract with Broda and, in Karoline's name, renouncing her claim to the shares, withdrawing her complaint, and vacating the injunction—all, so far as we can determine, without any benefit to Karoline's estate or even any protection of its interest in the proceeds of the sale. On this record, the litigation brought on behalf of Karoline, and continued after her death, would seem to have succeeded in blocking a sale of the shares at a higher price only to be withdrawn for the purpose of facilitating a sale to defendant's other clients at a lower price, with no more protection for Karoline's interest at the end than at the beginning. Absent a satisfactory explanation, this would give strong color to the claim that defendant, who had what we would consider a conflict of interest, acted at some stage in the litigation for a purpose other than to protect Karoline's interest in the shares, so that the process of the court was used "not to effect its proper function, but to accomplish *through it* some collateral object * * *." Hauser v. Bartow, supra, 273 N.Y. at 374, 7 N.E.2d at 269.

■ The judge's only finding as to the withdrawal of the injunction was that

"While this could be construed to be a breach of an attorney's duty on defendant's part, it is not one of which the plaintiff may complain since he benefited thereby by receiving from Broda the sales price of the released shares." That plaintiff ended up with half a loaf scarcely answers his complaint that the objective of defendant in obtaining the injunction and later vacating it was to benefit defendant's Austrian clients by depriving him of the whole one. There may be a full, complete, and innocent explanation of defendant's action. Perhaps it lies in the portions of the record that were not transcribed, so that the judge knew all about it. But neither his opinion, nor the defendant's brief on appeal, nor so much of the record as we have been able to read and comprehend (including the statement filed by defendant with the Austrian court when the injunction was withdrawn) has revealed it to us. Extensive as the record is, it also fails to answer such tantalizing questions as why defendant, after letting the first injunction lapse on January 31, 1954, deemed it in Karoline's interest to obtain a second one on May 20, 1954; who instructed Strauss and defendant, during the 11-month period between Karoline's death and the obtaining of the second injunction, and thereafter, as to what her interest was; and why arrangements could not have been worked out before November 7, 1954, so that Karoline's estate could benefit from plaintiff's apparently advantageous contract with Broda and the dispute, if any, could then continue over the proceeds. Without additional findings, we cannot sanction dismissal of plaintiff's complaint. But we also are not ready, without the benefit of further sifting of this prolix and confused record by the district judge, to conclude that there should be a judgment in plaintiff's favor.[5] We therefore

4. It is likewise unnecessary to consider what New York would say if it were proved that Austria went further than New York in recognizing claims for abuse of process or for wrongful initiation of legal proceedings. See International Films Distribution Establishment v. Paramount Pictures Corp., supra.

5. Even if the elements of a claim for abuse of process were otherwise made out, plaintiff might still be denied recovery if,

vacate the judgment of dismissal and remand for additional findings and conclusions, after such further proceedings (which may include the taking of additional evidence on the facts or on the Austrian law) as the judge may deem wise in the light of this opinion. 28 U.S.C. § 2106.

Plaintiff has filed with us a "Notice to the Court and Request", claiming he has recently discovered that certain signatures of his mother on letters and other papers received in evidence in the court below, including a letter purporting to authorize Strauss to institute one stage of the Austrian litigation against plaintiff, which he admitted to be genuine at the trial, are forgeries; he asks that the trial exhibits be kept in our custody "until they can be transferred * * * to the United States Attorney and the Criminal Courts for further action." We direct rather that our Clerk transfer the exhibits to the Clerk of the District Court for the Southern District of New York, to be held by him subject to further order by the district judge. Although we have no basis for crediting these charges, now that they have been raised the district judge, who can have the important aid of testimony by document experts, may think it right to pass on them if he determines that plaintiff's failure to raise the point earlier is excusable. Plaintiff's motion to reject defendant's appendices and to direct the preparation of a supplementary transcript is denied.

Appeal from order of August 6 treated as a motion for remand to permit the district judge to consider plaintiff's mo-tion for his disqualification and denied; judgment of March 16, 1962, dismissing the complaint vacated, and cause remanded for further proceedings consistent with this opinion; motions disposed of as indicated; costs of appeal to abide the ultimate outcome.

as defendant contends, the proof as to the higher price that would have been received upon timely delivery was inadequate, or it be found that, even in the absence of defendant's allegedly tortious conduct, plaintiff would still have been unable to perform his contract with Broda because of another Austrian court order—the "stay of delivery" obtained against plaintiff in the name of the estate of his brother Leopold Weiss—which independently blocked 98 shares included among the 217 plaintiff was to deliver. Although the judge's opinion upholds the latter contention, we would be reluctant to accept this as a bar to an otherwise valid claim for intentional harm, see American Law Institute, Restatement of Torts, § 870 and f, at least without more positive and detailed findings on such questions as whether the stay of delivery effectively blocked the shares even after the New York court administering Leopold's estate had upheld plaintiff as his legatee, and whether the stay was not itself obtained by someone acting for or in concert with defendant.