**MORGAN GUARANTY TRUST COMPANY OF NEW YORK, Morgan Grenfell & Co., Limited, the Bank of Tokyo, Limited, the Governor and Company of the Bank of Scotland and Orion Royal Bank, Limited, Plaintiffs,**

v.

**REPUBLIC OF PALAU, Defendant.**

No. 88 Civ. 0590 (RWS).

United States District Court, S.D. New York.

April 3, 1987.

As Amended April 8, 1987.

See also 639 F.Supp. 706.

Jones, Day, Reavis & Pogue (Barry R. Satine, of counsel), Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (Robert B. Wallace, of counsel), for plaintiffs.

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City (Wayne A. Cross, Susan L. Arinaga, of counsel), for defendant.

SWEET, District Judge.

Plaintiffs Morgan Guaranty Trust, Morgan Grenfell, The Bank of Tokyo, the Bank of Scotland, and Orion Royal Bank (collectively "the Guarantors") have moved this court pursuant to Fed.R.Civ.P. 56 for an order striking the affirmative defenses of the defendant the Republic of Palau ("Palau"), dismissing its counterclaims, and granting judgment in its favor for $36,129,003. Palau has opposed the Guarantors' application, but has not cross-moved. Both parties filed extensive briefs, and argument was heard on October 24, 1986, at which time parties requested and were granted leave to submit supplemental documents and memoranda of law. The motion was finally fully submitted on December 16, 1986. For the reasons set forth below, the Guarantors' application for an order granting it judgment on its claims is denied, and their application for dismissal of Palau's counterclaims is granted.

**Facts**

Seeking to provide badly needed electrical service for its citizens, the Republic of Palau borrowed $24,128,745.12 on June 8, 1983, from International Westminister Bank, PLC ("Nat West") and $8,200,000 from County Bank Ltd. ("County Bank") to finance a power generating plant that would be built by IPSECO International Power Systems Company, Ltd. of London ("IPSECO"). The five banks who are plaintiffs here—Morgan Guaranty Trust, Morgan Grenfell, The Bank of Tokyo, the Bank of Scotland, and Orion Royal Bank—were Guarantors of the loan.

In March, 1985, the first payment on the loan came due, and Palau did not make it. Consequently, the Guarantors paid the full amount of the debt plus interest, for which they are now suing Palau. Guarantors have moved for summary judgment against Palau in the amount of $36,129,003 plus interest and costs from April 4, 1986.

Palau opposes summary judgment on a number of grounds, including that it is immune from the jurisdiction of this court

due to sovereign immunity, but also on the substantive grounds: 1) that the contract under which the Guarantors are proceeding is void and unenforceable because Palau's executive exceeded the authority legislatively delegated to him in signing it; 2) that the agreement is void because Palau was fraudulently induced to enter into it. Palau has not cross-moved for summary judgment.

**Jurisdiction**

Palau has claimed that it is immune from the jurisdiction of this court pursuant to the Foreign Sovereign Immunity Act of 1976, 28 U.S.C. § 1602 *et seq.* Section 1604 of the Act provides:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604. Section 1605 sets out certain exceptions to a foreign state's jurisdictional immunity, relating primarily to various forms of waiver, and the banks point to provisions in the Recourse and Co-ordination Agreements in which Palau purports to waive its immunity from suit. Palau argues that any such waiver was not authorized under the law of Palau and therefore is void and unenforceable.

The financing documents pursuant to which Palau obtained financing for the power plant and pursuant to which plaintiffs guaranteed Palau's obligation to repay the loans were negotiated in 1982. In February of 1983, plaintiffs went to Palau with final versions of the financing documents, which the President of Palau signed. It was later feared that the executive branch lacked the authority under Palauan law to bind Palau to the financing arrangements with plaintiffs, and special legislation was sought authorizing the President to enter into contracts for the construction, operation and financing of the power station. As passed by the legislature of Palau, the Olbiil Era Kelulau ("OEK"), and approved by the President, the Act, RPPL 1–54, contained a clause allowing the President to waive Palau's

sovereign immunity. Pursuant to section 4 of Secretarial Order No. 3039, 44 Fed.Reg. No. 94, page 28116 (May 14, 1979), Palau submitted RPPL 1–54 to the High Commissioner of the Trust Territory of the Pacific Islands for her review. On May 5, 1983, the High Commissioner suspended section 2(b)(II) of RPPL 1–54, which empowered the President of Palau:

> to waive the immunity of the Republic of Palau from suit, attachment or execution to such extent as the President shall determine consistent with the constitution.

The ground for the High Commissioner's suspension was that waiver of Palau's immunity would expose United States grant funds to diversion from the purposes for which they were granted, contrary to United States law and Secretarial Order No. 3039.

According to Palau, although the High Commissioner's suspension of that part of the power plant legislation authorizing the President to waive Palau's immunity from suit was communicated to the banks in May of 1983, the banks did not remove from the financing documents the provisions waiving Palau's immunity. The Recourse Agreement and the Coordination Agreement, both of which contain waiver provisions, were fully executed in England on June 8, 1983. Palau submits that this history establishes that its representatives had no power to sign any agreement purporting to waive Palau's sovereign immunity from suit.

However, even accepting Palau's version as to waiver, the Guarantors submit that Palau's activity in this case is still not immune from jurisdiction. 28 U.S.C. § 1605(a)(2) provides that a foreign state shall not be immune from jurisdiction in any case:

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial

activity of the foreign state elsewhere and that act causes a direct effect in the United States.

At issue in this case is the performance by Palau of its obligations under the Recourse Agreement, which, as Section 6, Para. 6.01(i)(ii) of the Recourse Agreement explains, constitute commercial activity:

> [T]he execution and delivery of and the performance of its obligations under this Agreement by Palau constitute private and commercial acts done for private and commercial purposes ...

■ Moreover, the Supreme Court has held that the repudiation of a commercial debt is a commercial, and not a governmental, action:

> Repudiation of a commercial debt cannot, consistent with this restrictive approach to sovereign immunity, be treated as an act of state; for if it were, foreign governments, by merely repudiating the debt before or after its adjudication, would enjoy an immunity which our Government would not extend them under prevailing sovereign immunity principles in this country. This would undermine the policy supporting the restrictive view of immunity, which is to assure those engaging in commercial transactions with foreign sovereignties that their rights will be determined in the courts whenever possible.

*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 698–99, 96 S.Ct. 1854, 1863, 48 L.Ed.2d 301 (1976). Palau having cited no authority to the contrary, the activity in this case is not protected by sovereign immunity, and the court has jurisdiction.

**Ultra Vires**

Palau argues that its executive was not endowed with the requisite authority to commit the general revenues of the Republic to repay the loan, but rather was explic-itly statutorily limited to committing only revenues that resulted from the operation of the power plant itself. The case involves a difficult issue of statutory construction of laws passed by a still young—in terms of nation-lives—legislature.

Three Palauan laws are relevant to this case: RPPL 1–20, RPPL 1–54, and RPPL 2–10. RPPL 1–20, the National Government Private Borrowing Act, was enacted in 1981 to permit the President of Palau to negotiate loans with *private parties* for public work projects, including power plants. Under the law, the President is empowered to pledge the full faith and credit of Palau as security.

Believing that he was acting pursuant to RPPL 1–20, the Palauan President entered into negotiations for the construction and finance of a power plant, which involved extended discussions between IPSECO, Palauan representatives, and the various banks involved. In February, 1983, when the President signed the documents consumating the transaction, the Recourse Agreement included provisions pledging Palau's full faith and credit as security for the loan.[1] On the same day that the President signed the documents, the Palauan Acting Attorney General signed an opinion letter stating that all the loan documents complied with RPPL 1–20.

After the documents were signed, the Chief of Koror, a local Palau official, filed a lawsuit challenging the loan documents. One of the co-lenders with Nat West (which was responsible for about $24 million of the financing) was England's Export Credit Guarantee Department (the "ECGD"), which is an instrumentality of the government of England. In the Guarantors' words, this raised the possibility that the transaction "may not have been authorized by the National Private Borrowing Act," and consequently neither the Guarantors

---

1. For the first time, in two pages at the end of its Supplemental Memorandum submitted after oral argument, Palau argues that it never pledged its full faith and credit to repay the Project Loans. However, in the Recourse Agreement, the document that establishes Palau's obligation to the Guarantors in the event of default, Palau unconditionally and irrevocably pledges to fully indemnify the Guarantors for any expenses, damages, losses, costs, etc., without limitation; it then represents and warrants that it is authorized to pledge its full faith and credit for the performance of its obligations under the Recourse Agreement. Recourse Agreement, Para. 3.01 and 6.01. The only limitation upon Palau's sources for repayment of the loans is the land and water of Palau. *Id.* Para. 6.01(i)(iii).

nor the ECGD would go forward with the loan until special legislation was enacted to resolve the problem.

The ECGD hired U.S. counsel to draft legislation to be submitted to the OEK. The proposed legislation was introduced in the two houses of the OEK at the request of the President. As introduced, the bill contained two clauses of particular interest. Section 4(b) of the ECGD draft provided:

There shall be a debt service line item within the Unified Budget request for each fiscal year specifying the amount required for the payment due and owing under any loan agreement, bond or security issue, or other debt-related agreement. Such an amount shall be appropriated from the National Treasury from time to time as may be necessary.

Section 5(a) of the ECGD draft provided:

There is hereby appropriated from the National Treasury the sum of $3,800,000 for the purpose of providing necessary funds to pay for the Project or to pay any costs relating to debt services of said Project in Fiscal Year 1983.

These provisions plainly contemplated that the loans were to be secured not only by Project revenues, but by the general treasury of Palau. However, the House of Delegates' Committee on Resources and Development, the first committee in the OEK to consider the measure, deleted them both. In their place, the Committee inserted new sections 5(a) and 5(b), both of which would appear in the bill as signed into law as RPPL 1–54. The new sections provided:

(a) There is created within the National Treasury, a special revolving fund, to be called the "Power Plant Fund," into which net revenues from the Project shall be deposited and from which *all* expenditures for the repayment of principal or interest on any loans made under the authority granted in this act shall be made without fiscal-year limitation.

(b) There is hereby appropriated to the Minister of Administration such sums as may be necessary to repay all principal and interest on any loans made under the authority granted in this Act in the Fiscal Year 1983 and thereafter until all loans are extinguished, without fiscal-year limitation. (emphasis added).

Thus the Committee removed ECGD's language providing for appropriations from the general revenues and replaced it with language that directed that "all expenditures for the repayment of principal or interest" had to come from the fund of operating revenues. In the line by line analysis of the Committee's amendments, the Report explains the insertion of the provision for the revolving Project fund thus:

It is the intention of your Committee to establish in this bill a revolving fund into which all revenues from the power Project will be deposited and from which all repayment of principal and interest will be made. Since this Project should be self-financing, there will be no need for supplemental appropriations.

Stand. Comm.Report No. 315, Committee on Resources and Development, House of Delegates, First Olbiil Era Kelulau 5 (Apr. 19, 1983) [hereinafter cited as "House Report to RPPL 1–54"].

Likewise, in striking the $3.8 million which the ECGD sought to have appropriated the Committee stated:

This amendment provides that the bankers shall be repaid from *only the profits of the power Project.* It is the opinion of your Committee that if the Projections by IPSECO prove to be inaccurate, then the President must come before the Olbiil Era Kelulau and ask for a special subsidy.

*Id.* (emphasis added). As amended by the Committee, the bill passed the House of Delegates and was sent to the Senate. The Senate Committee on Resources and Development, noting that the "Project is intended to pay for itself," and that it "should not require appropriations from the national government," Stand.Comm.Rep. No. 309, Committee On Resources and Development, Senate, First Olbiil Era Kelulau 2 (Apr. 21, 1983), approved the bill "as the House as amended," *id.* at 3.

In sum, the Guarantors and the ECGD refused to go forward until there was new legislation, apparently believing that the

agreements signed by the President solely on the strength of RPPL 1–20 were *ultra vires.* At their insistence, the President submitted to the OEK a bill drafted by ECGD's counsel which not only cleared up any government-to-government problem posed by the agreements, but also dictated that funds from general revenues "shall be appropriated" to cover the Project. Instead, the OEK established the revolving fund and commanded "all" payments on the interest and principal must come from that fund.

The legislative history establishes that through these amendments the legislature thought it was withholding from the President the authority to commit funds from the Palauan general treasury: "This amendment provides that the bankers shall be repaid only from the profits of the power Project." House Report to RPPL 1–54 at 5. Palau urges that to sophisticated bankers who had already shown a willingness to demand legislation to clear up possible problems of an *ultra vires* contract, the OEK's deliberate amendment of the ECGD's proposal and the clear language of the report must certainly have established the limits of the President's lawful authority.

■ But despite this language in the committee reports, the Act itself contains textual provisions that can only be fairly construed to do exactly the opposite of what the committees thought they were doing. It is undisputed that RPPL 1–20 allowed the president to pledge the full faith and credit of Palau when arranging loans from *private* sources. Finding that RPPL 1–20 did not authorize the power plant project because of another government's involvement as a lender, the OEK passed RPPL 1–54 to expand the President's powers for this specific transaction. It reads: "It is the intention of the Olbiil Era Kelulau that this legislation grants to the President of Palau *all necessary authority* to implement the Project and supercedes any provision of existing legislation that is inconsistent herewith." RPPL 1–54 § 1(e) (emphasis added). Thus the OEK waived the provisions of RPPL 1–20 that had limited the President's ability to borrow—and to pledge the Republic's full

faith and credit in doing so—from private lenders only. Consequently, it was within the President's lawful authority to pledge the general treasury of Palau in the power plant contract.

Although this construction of RPPL 1–54 § 1(e) is apparently at odds with the legislature's intent, it is entirely consistent with the language of RPPL 1–54 § 3(a) that provides that "all expenditures for the repayment of principal or interest" on the loans "shall be made" from the Power Plant Fund. While § 5(a) demands that all loan payments must be funneled through the Fund, it does not say that *only* power plant revenues may be put into the Fund. That being the case, the Fund may be supplemented by other sources (such as the general treasury) when there is a shortfall. Consequently, there is nothing inconsistent in the fact that RPPL 1–54 simultaneously allowed the President to pledge Palau's full faith and credit while directing that the actual payments be funneled through a special, earmarked fund.

That the plain language of RPPL 1–54 did indeed allow the President to pledge funds from the general treasury—albeit inadvertently—is born out by the legislative history to a later act, RPPL 2–10. The Senate Committee on Ways and Means wrote in its report: "the original version of RPPL 1–54 did not adequately reflect the intent that the IPSECO Project be self supporting and that no funds other than Project revenues be used to service the Project debt." Stand Comm. Report No. [ ], Committee on Ways and Means, Senate, Second Olbiil Kelulau 1 (July 10, 1985). Similarly, "The Committee learned that the entire national treasury is available to repay the IPSECO debt under RPPL 1–54 as originally adopted." *Id.* *See also* Stand Comm. Report No. 12, Committee on Judiciary and Governmental Affairs, House of Delegates, Second Olbiil Kelulau 2 (July 24, 1985) ("Subsequent to approval of RPPL 1–54, the Olbiil Era Kelulau has learned that the entire National Treasury is available to repay the IPSECO debt."). The Committee's admission of the legislature's gaff confirms today's ruling; the court will give effect to what the OEK in fact said in

RPPL 1–20 and RPPL 1–54 rather than to what they might have meant to say.

### Fraudulent Inducement Defense

█ Palau also opposes summary judgment on the grounds that it was fraudulently induced to enter into the contracts. It is proceeding under two factually distinct fraudulent inducement theories. Palau's first theory is that the Guarantors induced the contract through a fraudulent omission. Specifically Palau alleges: a) the Palauans thought the Guarantors had projected that the Project would be self financing; b) the Guarantors knew that this is what the Palauans thought; c) in fact the Guarantors believed the Project could never be self financing; d) the Guarantors never corrected the Palauan's misconception as to the Guarantors' beliefs. According to Palau, the circumstances of the negotiations created in the Guarantors a duty to speak, which the Guarantors breached. Palau's second theory is that the Guarantors lied to Palau about what financing provisions the contracts did and did not contain, and that Palau relied on those misrepresentations and signed agreements containing provisions that they never consented to and would never have consented to.[2] The basic elements of a showing of fraudulent inducement are: "representation of a material existing fact, falsity, *scienter*, deception and injury." *Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 835.

As to Palau's first theory, the Guarantors argue that they never formed an opinion on whether the Project could be self-financing and never made any representations on the issue. They also argue that, even if such representations were made, Palau did not rely on them.

It is not contested that IPSECO represented time and again that it was projecting that the Project would generate sufficient revenues to be self-supporting. But, according to the Guarantors, they never formed an opinion about IPSECO's Projections, and consequently never either endorsed nor explicitly rejected them. The issue here is not whether IPSECO's Projections were good or bad, but whether the Guarantors had reached a conclusion as to them, and whether, having done so, they misrepresented that conclusion. Opinions, intentions and other states of mind are considered facts, which can be proved or disproved in a court. *See Bower v. Weisman*, 650 F.Supp. 1415, 1422 (S.D.N.Y. 1986); *Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 835 (1958); E. Farnsworth, *Contracts* § 4.11, at 237 (1982). Thus if the Guarantors had reached a conclusion as to IPSECO's Projections, that would be a fact, and if they then misrepresented that fact, and the misrepresentation was material, etc., then Palau has made out a case of fraudulent inducement to contract. *See generally Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958).

Although the Guarantors claim that they never reached a conclusion as to the accuracy of IPSECO's Projections, Palau has adduced evidence which may lead to a contrary conclusion. Morgan Grenfell & Co., Ltd. was the bank that organized the syndicate of Guarantors at IPSECO's request. Mr. John Stephen Sutton Syrett, the Morgan Grenfell director who was directly in charge of the Palau deal, testified in his deposition in this case that he never reached any conclusion. However, in a separate but factually related action being prosecuted in England, Syrett submitted a signed sworn statement in which he swears thrice that he did not believe IPSECO's

---

**2.** Palau has also advanced a theory that IPSECO is the Guarantors' agent, and the consequently any misstatements by IPSECO should be attributed to the Guarantors. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *In re Shulman Transport Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir.1984), *citing*, Restatement (Second) of Agency § 1(1) (1958). An essential characteristic in an agency relationship is that the agent is subject to the principal's direction. *Id.* There is no agency relationship where the alleged principal has no right of control over the alleged agent. *Ahn v. Rooney Pace, Inc.*, 624 F.Supp. 368, 370 (S.D.N.Y.1985). Palau has not pointed to any evidence that IPSECO was directed to speak for or was controlled by the Guarantors.

figures at all, a conclusion which he apparently reached upon his very first reading of the file: "I recall [IPSECO] was very positive about the Project being self-financing, but it became very clear on reading the file that there was no way in which this could occur"; "I did not believe the Project could be self-financing"; "I did not believe the Project to be self-financing."

To raise the issue that the other Guarantors knew of or agreed with Morgan Grenfell's analysis, Palau has submitted minutes of a series of meetings held at the offices of Morgan Grenfell on May 9, 1983. The first of the meetings held that day was a meeting of the Guarantors alone, without IPSECO, without Palau, and without any of the insurers. At the meeting, a letter from a local Palau official to the Guarantors was discussed. The local official, who was against the Project, informed the banks that IPSECO was claiming that the banks had confirmed its Projections, and asked the bank to confirm this. According to the minutes, one of the Guarantors opposed corresponding with the official, suggesting "that a letter to [the local official], stressing that the banks did not view the Project as 'self-financing,' might give [him] a stronger case to argue with in Palau itself, and that the banks should limit any such representations to the President only." When the Guarantors came down to actual decisionmaking, however, even this suggested notice to the President had apparently gone by the wayside:

> The Guarantors decided unanimously that, in order to proceed with the transaction ... the Palauans must be made aware that the banks are not entering this deal intending that the revenues of the Project are to be the primary sources of payback. However, it was agreed that some assurance from the Contractors be sought to the effect that the Project itself was viable financially, and that the Insurance Policy was therefore unlikely to be called.

On a summary judgment motion the court must draw all reasonable inferences in favor of the non-moving party. One reasonable inference from the language in the memo that the Guarantors discussed IPSECO's Projections as a group, and that they did not believe them. It is similarly reasonable to infer that the bankers were not concerned that Palau would sign the contract while operating under a misapprehension, but rather were concerned that they would get their money even if the project failed, as they expected it would, to be self-financing. Indeed it can even be inferred that the Guarantors, while themselves disbelieving IPSECO's projections, were, nonetheless, encouraging IPSECO to give "assurance" for reasons related to insurance coverage. Furthermore, the banks' desire not to give the local official "a stronger case" may indicate their belief that their conclusion would be material and might affect the transaction the deal if word got out to Palau that the banks' opinion was that the Project was not self-financing. In any event, the opinions of seven highly regarded banks as to the nonprofitability of a proposed Project may be inferred to be material to the go-ahead decision.

The same memo also memorializes the meeting later in the day at which the Guarantors, IPSECO, and representatives from Palau were all present. As discussed, going into this meeting, the Guarantors were on notice (from the Palauan local official's letter) that IPSECO had told Palau that the Guarantors had approved IPSECO's Projections. At the meeting, IPSECO made a long presentation to show that the Project was indeed self-financing. Knowing that Palau had already been told that the Guarantors had endorsed IPSECO's projections, what the Guarantors said—and did not say—after the presentation is crucial. They did not say that they disagreed with IPSECO's Projections, and they did not even say that they would neither confirm nor deny them. Instead the memo reports that a Morgan Grenfell spokesman "pressed the point that regardless of the Project's revenues, the Palauans must meet their obligations under the loan agreements," a comment in no way inconsistent with the proposition that the Guarantors agreed with IPSECO.[3]

---

**3.** Although the Guarantors claim in their papers that at this point they "made it clear [they] were    not agreeing with any IPSECO projection," the

■ Under New York law, omissions of material fact may rise to a level constituting fraud if a duty to disclose exists. *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 123 (2d Cir.1984). "During the course of negotiations surrounding a business transaction, a duty to disclose may arise ... where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Id.* (citations omitted). Along the same lines, the Second Restatement of Contracts provides:

> A person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist ... where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts of a failure to act in good faith and in accordance with reasonable standards of fair dealing.

Restatement (Second) of Contracts § 161(b) (1981); *see also* E. Farnsworth, *Contracts* § 4.11, at 240–41 (1982).

Half-truths can actually be regarded as crossing the line from non-disclosure to an active false assertion of fact:

> A statement may be true with respect to the facts stated, but may fail to include qualifying matter necessary to prevent the implication of an assertion that is false with respect to other facts.... Such a half-truth may be as misleading as an assertion that is wholly false.

Restatement (Second) of Contracts § 159 comment b (1981) ("Half-truths").

As to the question of Palau's reliance, *see Brown v. Lockwood*, 76 A.D.2d 721, 432 N.Y.S.2d 186, 193 (2d Dept.1980), the legislative history to RPPL 1–54 presents sufficient evidence to establish a question of fact. After reciting numerous times that the Project is reported to be self-financing, the House Report notes: "since the bankers are willing to risk their capital on this loan, they must be persuaded it is viable." House Report to RPPL 1–54, at 2. At trial, of course, the burden of proving reliance will fall on Palau to show that had the bankers made the necessary disclosure, then Palau would not have gone forward with the Project.

■ The inferences in favor of the non-moving party are the following: 1) Palau thought that the Guarantors believed the Project to be self-financing; 2) the Guarantors knew of Palau's misconception, but did not correct it, even though the fact of what conclusion that Guarantors had reached was exclusively within the Guarantors' knowledge; 3) the Guarantors did not correct Palau's misconception because they feared that doing so would cause Palau to back out of the deal, which it might have. If proved, these facts would form a defense to the contract, and consequently the Guarantors' motion for summary judgment is denied.

According to Palau, the Guarantors also fraudulently induced the contract by falsely representing to Palau that the financing

---

places in the record to which they cite do not support this. Takeo Takuma, the Guarantor who has suggested not send the local official a letter, testified at his deposition:

> I do not remember whether we especially talked about the source of repayment. However, my recollection was that no matter what happened with the project, the primary responsibility of repayment rests on [the] Republic of Palau, so, you are obliged to pay.

Takuma pointedly did *not* testify that the banks disassociated themselves from IPSECO's projections.

The Guarantors have likewise directed the court to testimony given by Paul Zink, who was also at the meeting:

> Q. Did the guarantors say anything after IPSECO made its presentation?

> A. My recollection is that [the Morgan Grenfell spokesman] conveyed the sense of what the guarantors had agreed in their initial meeting, that we looked at this as Palau's obligation, and had nothing to do with the projections which were presented or received at that point.

It is difficult to tell whether Zink testified that the "obligation" had nothing to do with the projections or the "guarantors" had nothing to do with the projection, but the former is consistent with the memo itself and with Takuma's testimony. Resolving Zink's ambiguity in favor of Palau, the Guarantors have failed to come forward with evidence that the Guarantors disassociated themselves from IPSECO's projections.

documents provided for repayment exclusively from project revenues. In opposing the Guarantors' motion for summary judgment, Palau has presented affidavits from Victorio Uherbelau ("Uherbelau"), counsel to the President of Palau, and Alfonso Oiferong ("Oiferong"), former Vice-President of Palau, on which Palau is relying to create an issue of material fact with respect to its defense.

On a motion for summary judgment, the moving party can carry its burden by pointing out to the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* — U.S. —, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). According to the Guarantors, there is a vacuum of evidence on the question of whether they—as opposed to IPSECO—falsely stated the contents of the financing documents. In many of the documents it is, indeed, difficult to tell who allegedly made the false representations. The following paragraph from Uherbelau's affidavit is fairly typical:

> Following nearly a year of discussions, Morgan Grenfell and IPSECO came to Palau with an entire set of documents, including all of the financing documents which are the subject of this action. These documents were ready to be signed with blank dates in them. *After it was explained* to officials of Palau as well as the Task Force that the documents reflected what had been agreed with the Task Force, including the fact that the Project would be entirely self-financing with no obligation by Palau except to pledge Project revenues for repayment of the debt, president Remeliik signed the documents on behalf of Palau. (emphasis added)

Uherbelau's phrase "after it was explained" fails to identify who the fraudulent party is. Likewise, Uherbelau describes another incident in Palau:

> [R]epresentatives of the Morgan Grenfell/IPSECO group came to Palau. An extensive presentation *was made on their behalf* to the OEK and to its leaders explaining that the Project would be entirely self-financing and that the financing documents contained provisions calling for repayment of the Project

loans exclusively from Project revenues. (emphasis added)

Again, Uherbelau has avoided saying that the Guarantors made false statements. Rather, he speaks of a vague Morgan Grenfell/IPSECO "group" and statements that are made by an unidentified party on their "behalf."

■ However, Oiferong's declaration directly implicates the Guarantors. He describes hearings held by the OEK in Palau which representatives of both IPSECO and the banks attended:

> Presentations were made to the OEK regarding the project financing nature of the Project and the financial projections for the Project. This financial presentation was made by IPSECO *and concurred in by the banks* .... The entire theme of those presentations was that the Project would be self-financing based upon projections of revenues and, more significantly, that the financing documents provided for such project financing with an insurance policy for the banks if it failed. (emphasis added)

Later, when the documents were finally to be signed, Oiferong reports:

> In May, 1983, the Task Force traveled to London to finalize the financing documents. *The banks represented* that the documents presented by them at that time complied in all respects with the presentations made to the Task Force and directly to the OEK. (emphasis added)

Consequently, Palau has raised a triable issue of fact as to whether the Guarantors made false representations about the contents of the contract.

The Guarantors have also argued that even if they did make misrepresentations, Palau cannot be said to have relied on them because of the general rule that one is presumed to know what one signs. "If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him." *Gaskin v. Handel,* 390 F.Supp. 361, 366 (S.D.N.Y.1975) (quoting *Pimpinello v. Swift & Co.,* 253 N.Y.

159, 162–63, 170 N.E. 530 (1930)). Even the Guarantors, however, concede that the "exception to this rule is fraud." Guarantors' Reply Memorandum at 24. As Palau points out, "An oral representation which is fraudulent and which induces reliance may be a defense *even though it contradicts a provision of a written contract.*" *Centronics Financial Corp. v. El Conquistador Hotel Corp.*, 573 F.2d 779, 782 (2d Cir. 1978) (emphasis added). Consequently, summary judgment on this issue is also denied.[4]

### Estoppel and Mistake Defenses

Palau's defenses of equitable estoppel and mistake depend on many of the factual issues relevant to the defense of fraudulent inducement that has survived the Guarantor's summary judgment attack. Consequently the Guarantor's motion to strike them is denied.

### Palau's Third, Ninth, and Tenth Defenses

Palau's Third Defense seeks dismissal of this action on the ground that Guarantors failed to join indispensable parties, IPSECO and the lending banks, who Palau believes acted in concert with the Guarantors in fraudulently inducing Palau to agree to the project to construct and finance the power plant in Palau. The Ninth and Tenth Defenses also rest upon Guarantors' alleged relationship with IPSECO and the lending banks. Palau charges that the Guarantors are partners or coventurers with IPSECO and the lenders, who consequently owed Palau a fiduciary duty not to disburse progress payments to IPSECO from loan funds, when IPSECO had breached the construction contract with Palau by failing adequately to perform.

■ The Guarantors have produced evidence to deny any sort of business relationship with IPSECO or the lending banks as partners or coventurers, and Palau now opposes summary judgment on the three defenses solely on the grounds that it needs more discovery on the issues. However, Palau has already deposed Syrett and Hudson of Morgan Grenfell, and it is settled that "a party [may not] rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986). Likewise, "a 'bare assertion that evidence to support a fanciful allegation lies within the exclusive control of the defendants, and can be obtained only through discovery, is not sufficient to defeat a motion for summary judgment.' " *Id.* (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 251 (2d Cir.1985)).

### Palau's Counterclaims

Palau's first counterclaim alleges that the Guarantors were bound by the financing document to purchase insurance indemnifying them against the possibility of Palau's default. Palau further alleges that it paid the Guarantors more than $800,000 to be used as premiums for the insurance, but that the Guarantors did not in fact purchase insurance which protects against a default. Consequently, says Palau, the Guarantors have converted the premium money that it paid.

In its Rule 56 motion to dismiss the counterclaim, the Guarantors point to an absence of evidence in Palau's case—that Palau paid the premiums that they alleged they did. Under *Celotex*, this shifts the burden to Palau to produce evidence in support of an element for which it will have the burden of proof at trial, 106 S.Ct. at 2554, and consequently Palau must come forward with evidence that it did pay the premiums. Although Palau's reply papers again state the conclusion that it has paid the premiums, the papers point to no evidence in the record that supports this proposition. Therefore, Palau's first counterclaim is dismissed.

■ Palau's second counterclaim alleges that the Guarantors' "claims ... are predi-

---

**4.** The Guarantors have also relied on an opinion letter signed by then Acting Attorney General Victorio Uherbelau to the effect that the loan was other than project financing and that Palauan law authorized this. Palau has taken the same position with respect to the letter that it has taken with respect to the contract. Uherbe- lau, who graduated from a U.S. law school but is not admitted to practice either here or in Palau, has said that he was presented with a typed opinion letter by Morgan Grenfell's counsel which he signed on their representation that the project was self-financing.

cated on [their] own fraudulent conduct and upon their own breach of contractual and fiduciary duties. Their assertion of such claims is therefore tortious." Although Palau had tried to characterize this counterclaim as a defamation claim, it is instead an action for malicious prosecution, "where the gist of the wrong is the initiation of an unjustifiable legal proceeding." *Weiss v. Hunna*, 312 F.2d 711, 716 (2d Cir.1963), *cert. denied*, 374 U.S. 853, 83 S.Ct. 1920, 10 L.Ed.2d 1073 (1963), *reh'g denied*, 375 U.S. 874, 84 S.Ct. 37, 11 L.Ed.2d 104 (1963). In order to maintain a cause of action for malicious prosecution, the alleged malicious lawsuit must have been terminated in favor of the claimant. *The Savage is Loose Co. v. United Artists Theatre Circuit, Inc.*, 413 F.Supp. 555, 561–62 (S.D.N.Y.1976). As this action has obviously not yet been terminated, the counterclaim is premature and is therefore dismissed.

**Conclusion**

For the foregoing reasons, the Guarantors' motion to dismiss Palau's counterclaims is granted, and its motion for an order granting judgment in its favor on its claims is denied. A pretrial conference will be set at the convenience of the parties.

IT IS SO ORDERED.