**MORGAN GUARANTY TRUST COMPANY OF NEW YORK, Morgan Grenfell & Co., Limited, the Bank of Tokyo Limited, the Governor and Company of the Bank of Scotland and Orion Royal Bank Limited, Plaintiffs,**

v.

**REPUBLIC OF PALAU, Defendant.**

No. 86 Civ. 0590 (RWS).

United States District Court,
S.D. New York.

Aug. 5, 1988.

---

Jones, Day, Reavis & Pogue (Robert Layton, Barry R. Satine, of counsel), Wilson, Elser, Moskowitz, Edelman & Dicker (Robert B. Wallace, of counsel), New York City, for plaintiffs.

Reboul, MacMurray, Hewitt, Maynard & Kristol (Wayne A. Cross, Stephen J. Riegel, Stephen P. Falvey, of counsel), New York City, for defendant.

## OPINION

SWEET, District Judge.

Plaintiffs Morgan Guaranty Trust Company of New York ("MGT"), Morgan Grenfell & Co. Limited ("Morgan Grenfell"), Bank of Tokyo, Ltd., The Governor and Company of the Bank of Scotland, and Orion Royal Bank Limited, are banking institutions (collectively the "Guarantors"), that seek to recover from defendant Republic of Palau ("Palau"), a foreign state and from 1981–1983 a Trust Territory of the United States, over $40 million arising out of the financing in 1983 of a power plant thereafter constructed on the island of Babeldoab for Palau. The action was tried before the court, and in accordance with the

following findings of fact and conclusions of law judgment will be entered on behalf of the Guarantors.

The facility was projected to consist of a 16MW power station (the "Plant") and a fuel storage facility (collectively the "Project"). It was to be built for Palau with funds lent by County Bank Limited ("County Bank") and International Westminster Bank PLC ("Nat West"), the repayment of which was guaranteed by the Guarantors. The Plant produces electricity, but to date without charge.

In March of 1985 Palau defaulted on repayment of the loans. As a result of the defaults the guarantees were called, and the Guarantors performed their undertaking and commenced an action for repayment. Palau has alleged affirmative defenses of fraud and mistake alleging its understanding that the payments for the underlying loan were to be self-financing from sales of electricity from the Plant and fuel from the tank farm.

This action has presented an involved factual matrix and complicated issues of sovereignty and commercial law arising out of the struggle of the unsophisticated island people of Palau to achieve independence, both economic and political. Sympathy and support for those seeking to emerge from a colonial status must be balanced against the rights of those who provided the means to conduct the struggle. The difficulty of the resolution was aided by the skill of counsel for the parties during the litigation. It is recognized that this decision is but one step along what may turn out to be a long road, but at least this phase has been completed, hopefully in a fashion which may assist others who may have to confront these challenging issues.

*Prior Proceedings*

This action was initiated by a petition for removal filed on January 21, 1986, the action having been commenced by the Guarantors in the Supreme Court of the State of New York on December 17, 1985.

By motion of March 3, 1986 the Guarantors sought a remand to the state court, alleging a lack of diversity jurisdiction on the grounds that Palau was not a foreign state. By an opinion of July 10, 1986 after a review of Palau's status from World War I to the present time, having considered the establishment of the Palauan Constitution on January 1, 1981 and the effect of the Final Compact of Free Association (the "Compact"), the motion was denied.

In an opinion of April 3, 1987, in response to Palau's motion for summary judgment, the court held that Palau is not immune from the jurisdiction of this court by reason of sovereign immunity and that Palau's executive did not exceed the authority legislatively delegated to him by signing the loan agreements, the Recourse Agreement, and the Coordination Agreement. The Guarantors' cross-motion for summary judgment was also denied, 657 F.Supp. 1475.

Palau initially claimed in support of its counterclaim and affirmative defense of fraud and mistake that representatives of the Guarantors had stated in the presence of the Palauan representatives concurrence with revenue projections made prior to its construction of the Plant by the proponent of the Project, its contractor. One such declaration was considered in connection with the court's denial of the request for summary judgment on behalf of the Guarantors. Three days before trial Palau disavowed the truth of the declaration.

Palau again moved to dismiss on the grounds of sovereign immunity relying on Public Law 99–658, § 104(e), 48 U.S.C. § 1681 (Supp.1987) and by an opinion of January 29, 1988 the motion was denied.

The facts and conclusions as set forth in the opinions referred to above have not been controverted by the evidence adduced at trial, and they are here adopted in addition to those set forth below. Familiarity with the opinions is assumed.

After discovery and the proceedings just described, the action was tried to the court from April 11 to April 18, 1988. Final argument and submission were heard on June 24, 1988.

FINDINGS OF FACT

Palau is a 200 island archipelago in the south central Pacific ocean, approximately

4,000 miles west of Hawaii and 600 miles east of the Philippines. Its population is approximately 14,200 and its principal commercial activity is fishing.[1] Its natural resources are limited.

Palau became a Trust Territory of the United States in accordance with resolution of the United Nations after World War II. It has received over the years approximately $20 million in aid annually from the United States while it was a Trust Territory and is administered by the Department of the Interior ("Interior"). Palau sought to achieve its independence through a Compact of Free Association with the United States which is in the process of ratification and, it is hoped by Palau, final adoption by all the necessary parties. The process has been complicated in part by rights sought to be reserved by the United States for its security purposes. In the event that the Compact is performed, it is anticipated that Palau will receive $28 million in Compact Funds.

In 1981, Palau recognized that obtaining a reliable source of electrical power was an urgent national priority for the well-being of Palau's people and the development of the national economy. Its existing generators on loan from the United States were inadequate and frequently inoperative. Palauan President Haruo Remeliik ("Remeliik") appointed a Task Force, headed by Vice President Alfonso Oiterong ("Oiterong") to look for solutions to Palau's power problem.

In September 1981 International Power Systems Company Ltd. of London ("IPSECO") made a proposal for a 16 megawatt diesel power plant and a fuel storage facility. The proposal was advanced by the President of IPSECO, Gordon Mochrie ("Mochrie"), who had arranged for the construction of a power plant in the Marshall Islands. IPSECO is today defunct. The Olbiil Era Kelulau, the legislative body of Palau, ("OEK") enacted Republic of Palau Public Law ("RPPL") 1–20 (the "National Government Private Borrowing Authority Act") at a time when the Treasury was almost $2 million in debt. The Act provid-

ed that the Palauan Congress delegated to the Palauan President the authority to borrow up to thirty-five million dollars from non-governmental bodies for public purposes including power development. The Act further provided that the borrowing would be backed by the full faith and credit of Palau.

The Task Force entered into negotiations with IPSECO for construction of the Plant in Palau. On December 15, 1981, Palau and IPSECO signed a Statement of Understanding and Agreement to enter into good faith negotiations and on February 2, 1982, Palau and IPSECO signed an agreement ("Supply Contract") for the construction by IPSECO of the Plant, subject to the conclusion of financing for the Project. IPSECO agreed to locate and arrange financing and made preliminary efforts with Lloyd's Bank International which were unsuccessful. The Plant was proposed to be self-financing.

Palau requested the United States to provide technical assistance to determine the viability of the undertaking. As a result of this request, two officials from the Inspector General's Office of the DOI, accompanied by an Assistant Attorney General from the Trust Territory Government ("TTG"), arrived in Palau in May of 1982 to conduct an inspection and investigation.

In June of 1982, an insurance broker introduced Mochrie to Stephen Syrett ("Syrett"), presently a director of Morgan Grenfell, who was at the time heading a small section of the bank dealing with export guarantees and George Hudson ("Hudson"), an employee of Morgan Grenfell and an assistant to Syrett. Mochrie explained that a financing package had been discussed with Lloyd's Bank International, but he did not think that bank could put it together. Syrett told Mochrie that based upon the package available at that time, Morgan Grenfell was not prepared to go into the transaction. The package that Mochrie had discussed included a three year policy insuring against frustration of repayments. Mochrie left Syrett with

---

1. *Encyclopedia Britannica,* 1988 Book of the    Year, pp. 750–51.

background documents describing the United States aid and the funds that Palau was to receive pursuant to the Compact. Syrett instructed Hudson to draft a security package which would include insurance that would cover more than three years of the loan, the availability of Compact funds and an escrow account. Syrett believed IPSECO's revenue projections were overly optimistic.

In September of 1982, a Palauan delegation including Oiterong, Minister of Finance Haruo Willter ("Willter"), Task Force Secretary David Nolan ("Nolan"), Chief Ibedul Gibbons of the Koror, ("the Ibedul"), a traditional Chieftain with tribal authority and in addition the Mayor of Koror, Palau's principal state containing more than 50% of its population, and the Ibedul's counsel Patrick Smith ("Smith") traveled to Guam to meet with IPSECO and Morgan Grenfell. It had been proposed that the Plant be constructed on Koror.

A presentation was made by Hudson and Colin Berry of Morgan Grenfell concerning a series of bank accounts from which lenders could be repaid on the basis of a full recourse loan. Repayments were to be made from a Collateral/Escrow Account. This account was funded by a Project Account, with shortfalls being made up from a General Account. The Project Account was to receive Project revenues. The General Account was to be an account through which Palau would pass U.S. aid and other Palauan revenue. Hudson drew a diagram illustrating the flow of funds. He used the word Compact in the diagram, but was told not to use that term because the Compact was a sensitive issue. Colin Berry therefore replaced references to the Compact with references to U.S. aid.

During the course of the meeting IPSECO made a presentation regarding expected revenues derived from the power plant and the tank farm which would store fuel for the plant as well as for sale. Morgan Grenfell did not comment on these projections.

The Palauans took the position that U.S. aid could not be deposited directly into the General Account without first going to Palau, and the meeting ended with the Palauans agreeing to consider the Morgan Grenfell proposal.

Morgan Grenfell proceeded to put together a syndicate of guarantors to guarantee the lenders and the Export Credit Guarantee Department ("ECGD") of the British Government. Morgan Grenfell undertook to serve as agent for the guarantor syndicate in the negotiations with Palau relating to the Plant. Morgan Grenfell intended to obtain the security of U.S. aid. An insurance policy against the failure of Palau to fund the repayment accounts or to obtain U.S. aid or Compact Funds was an essential component to the financing.

In November of 1982, a Palauan delegation including Willter, Nolan, Victorio Uherbelau ("Uherbelau"), the Special Assistant of the President of Palau for Legal Affairs and Acting Attorney General from January 1983 to October 1984, Smith and members of the Palauan Congress traveled to London to meet with IPSECO and Morgan Grenfell. Uherbelau was a law school graduate who has never been admitted to practice. The purpose of this meeting was to review Morgan Grenfell's drafts of proposed agreements.

Willter headed the delegation which spent more than one week reviewing loan agreements, a Coordination Agreement and a Recourse Agreement at the Hotel Athenaeum. The documents were reviewed by the Palauan delegation line by line. Uherbelau and Smith did a detailed review of the documents which provided for a Collateral Account, a Project Account and a General Account, as had been discussed in Guam, and for a default if payments were not made on time, in which event the entire indebtedness could become due. Included as part of the documents reviewed by the Palauans was the form of legal opinion that would be required from the Palauan Attorney General.

During the course of the meeting, Mochrie stated that Project revenues would be sufficient to repay the loans. Syrett stated to the Palauans that Morgan Grenfell neither could agree nor disagree with the projections and that Morgan Grenfell was not

relying upon Project revenues but rather was relying upon the sovereign risk of Palau to repay the loans. Syrett recognized that his views were unwelcome to Mochrie.

The documents stated that Compact funds would be deposited directly into the General Account. The Palauans insisted that the references to the Compact be deleted, maintaining that Compact funds could not go into the General Account until they were appropriated for that purpose by the Palauan Congress. The word "Compact" was removed from the documents.

At the conclusion of the meeting, Willter initialled copies of the documents and agreed that upon returning to Palau he would examine Palau's overall budget. Morgan Grenfell agreed to refine the documents in accordance with the discussions. The Palauans were not advised of the terms of the proposed insurance, only that its cost was part of the package.

When the Palauan delegation returned to Palau a trip report was prepared which stated that they successfully had resisted efforts to make the Project other than self-financing (the Guarantors were not sent a copy of this report). However, Smith told Willter that the proposed documents did not agree with the concept of non-recourse project financing. Willter conferred with Uherbelau. Smith attempted to telephone Syrett. Shortly thereafter, Nolan on instruction of Oiterong advised Syrett that the only Palauans with whom Morgan Grenfell was to communicate were Oiterong, Willter and Nolan.

In January 1983, Hudson sent revised drafts of the documents to Palau. Willter forwarded them to Uherbelau. Oiterong sent copies of the revised drafts to the Vice Speaker of the Palauan House of Delegates and the Vice President of the Palauan Senate.

The Task Force received differing legal opinions regarding the loan documentation and Palauan law, including RPPL 1–20. Oiterong invited a number of Palauan attorneys to attend a meeting on February 9, 1983. The invitees were Uherbelau, Johnson, Smith, Robert Rigler (Senior House of Delegates Legislative Counsel), Michael Mirando (Special Legal Counsel, Office of the Ambassador for Status Negotiations and Trade Relations) and Peter Crook (Assistant Attorney General). The six attorneys reviewed and discussed the loan documentation and the effect of Palauan law on the transaction. They agreed that Uherbelau would draft legislation providing for an appropriation of the first year's debt servicing and for a multi-year authorization in the total amount of the loan agreements.

In February 1983, Syrett and Hudson traveled to Palau to execute the agreements which had been sent to Willter in January and on February 24, 1983, Remelik signed a Loan Agreement with Nat West and ECGD; a Loan Agreement with County Bank; a Coordination Agreement; and a Recourse Agreement.

Uherbelau, acting upon the instructions of Oiterong, signed an opinion letter in which he stated that he had examined the agreements, that Palau had authority to enter into the agreements; that the President had authority to pledge Palau's full faith and credit, that Palau's obligations under the loan agreements were direct, general, and unconditional and ranked at least pari passu with all other present and future unsecured and unsubordinated obligations, and that the choices of English and New York law were valid. Uherbelau understood that he was certifying that the President had sufficient legal authority to execute the documents.

In March 1983, the Ibedul commenced an action in the Palauan courts alleging that the various agreements had been entered into in violation of Palauan law. One of the allegations was that under existing law the President could not enter into an agreement with ECGD because that was a government to government loan. The Ibedul's suit sought a declaration that the agreements were null and void. It was suggested during the trial that the Ibedul's position was to some degree related to a demand for payments in exchange for permission to go forward with the Project on Koror. The Plant was subsequently constructed on an island other than Koror.

Several days after the commencement of the Ibedul's lawsuit, Uherbelau issued an opinion letter concluding that Remeliik had properly exercised his authority under RPPL 1–20 in executing the agreements. Uherbelau also opined that because RPPL 1–20 provided that the Palauan Congress would appropriate the sums necessary to meet obligations incurred under the Act, it was not necessary that the funds be appropriated prior to execution of the agreements.

ECGD determined that corrective legislation authorizing the loans should be enacted. On March 28–29, 1983, Uherbelau and Mirando met in Washington, D.C., with attorneys from Wilmer, Cutler & Pickering ("WC & P"), counsel to ECGD. The Palauan and WC & P attorneys reviewed the Ibedul's contentions as well as proposed legislation which the Palauans had drafted and brought with them. The proposed legislation granted the Palauan President authority to enter into government to government loans, it appropriated funds to ensure repayment of the loans, and it authorized the Palauan President to waive sovereign immunity.

On March 29, 1983, Uherbelau signed an opinion letter addressed to WC & P, in which Uherbelau stated that he had examined the proposed loan agreement between Palau and Nat West signed by Remeliik on February 24, 1983, and he opined on a number of the provisions in that loan agreement and cabled proposed legislation to Oiterong. He advised Oiterong that enactment of the legislation was mandatory for ECGD execution of the loan agreement. On March 29, 1983, the Palauan and ECGD attorneys also prepared a completion memorandum. Palau undertook to provide WC & P with copies of documents demonstrating that Palau had notified TTG, DOI and the State Department regarding the project.

From Washington, Uherbelau and Mirando traveled to London. On March 31, 1983, they met with representatives of ECGD and Nat West. Uherbelau introduced himself and Mirando as legal counsel advising the Task Force. ECGD stated that it was a requirement that Palau and Nat West review the Nat West Loan Agreement in the presence of ECGD so as to ensure ECGD that Palau understood the document. The meeting proceeded and the Nat West Loan Agreement was reviewed clause by clause. After the meeting, Uherbelau met with Hudson and retrieved the documents which had been signed by Remeliik and Uherbelau in February.

In April 1983, a pretrial statement was filed by Smith on behalf of the Ibedul. The statement explained in detail the terms of the Nat West and County Bank loan agreements, the Recourse Agreement, and the Coordination Agreement, including the accounts which were to be established under the Coordination Agreement. One of the documents cited in the pretrial statement as a trial exhibit was a December 1982 report of the U.S. Department of Energy. This report stated that it was the intent of Palau that the proposed Project eventually be self-financing, and indicated that the Project would produce revenues which could be used to service the debt.

On April 15, 1983, the Inspector General of DOI in an exit interview following site visits by DOI officials, informed Oiterong that Palau had not followed sound management practices with respect to the Project and its financing.

The OEK held legislative hearings commencing on April 21 with respect to the bill which had resulted from the Washington meetings. Mochrie appeared at the hearing and made presentations in support of the Project, representing that the Project would be self-financing from its revenues and further stated that the banks had confirmed the self-financing nature of the Project. At the hearing of April 21, he stated:

(illegible) requires permission to the banks and before able to make an application for what we call project financing or loan facilities. The banks in conjunction with E.C.D.G. [sic]—this is the government arm that overall guaranties [sic] loan—must be absolutely [sic] sure themselves of the project we are presenting is viable. Now we carried out this

study very comprehensively through two and a half years ago.... So we do have a report, but not what we've made through the half year ago that have the approval by the U.K. authorities and the banks in question who then gave approval that we could come and offer a loan to this project....

No representative of the Guarantors was present during this testimony, contrary to the Palauan representation made in connection with the summary judgment motions.

The OEK then amended the proposed bill to authorize the president to enter into a loan to be financed from revenues from the Project and passed RPPL 1–54 which created a special fund in the national treasury "into which net revenues from the project shall be deposited and from which all expenditures for the repayment of principal or interest on any loans made under the authority granted in this Act shall be made." It additionally appropriated such sums in the Power Plant Fund to the Minister of Administration to repay all principal and interest in the loans.

The House of Delegates' Committee Report on RPPL 1–54 stated:

the most attractive feature of this proposal is that it is *self-financing*, according to the Task Force members. IPSECO claims and the Task Force has repeatedly maintained that the project will be able to generate enough revenues from the sale of fuel oil to pay off the loans to the bankers *without* any appropriations by the National Government. Although the Task Force never contracted with an independent engineering consultant to substantiate those claims, it has maintained that "since the bankers are willing to risk their capital on this loan, they must be persuaded it is viable." (emphasis in original).

In the words of the Senate Committee Report, "This project is intended to pay for itself through utility rates and the sale of fuel from the fuel storage facility. It should not require any appropriations from the national government." Palauan Task Force members, some of whom were present at the legislative hearings, testified to their belief that the Act only conferred authority to enter into a self-financing loan, including Oiterong.

Uherbelau traveled to Saipan to hand carry RPPL 1–54 to the High Commissioner and answer any questions she had concerning that law and the Project. TTG Attorney General Kent Harvey ("Harvey") raised concerns about the authorization of the waiver of sovereign immunity contained in RPPL 1–54. Harvey pointed out to Uherbelau that DOI funds might be subject to attachment in the event of a loan default. Harvey also pointed out that under RPPL 1–54 Palau might supplement deficiencies in the Special Revolving Fund Account with DOI grant funds. Uherbelau responded that Palau would use local revenues for this purpose.

Shortly after the OEK hearings, the Ibedul sent an April 23 letter to each of the banks which referred to representations made by IPSECO to the Palauans in April 1983 that (i) the "international banks and the British Government have examined all of IPSECO's projections in detail and have assured the Presidential Task Force on Palau Power that the project is in fact self-financing" and (ii) the "international bankers and the British Government are fully aware of the severe financial constraints of the Republic if Palau and would not support the project unless it was self-financing." The banks were asked to confirm in writing that these representations were true and to provide any studies they had made of the financial feasibility of the Project. The letter then made a critical analysis of IPSECO's revenue projections.

On May 5, 1983, the High Commissioner suspended the waiver of sovereign immunity provision contained in RPPL 1–54.

In May of 1983, a Palauan delegation including Oiterong, Uherbelau, Mirando and Ambassador for Trade and Status Negotiations Lazarus Salii ("Salii") were on their way to the United States for trusteeship council meetings, and it was agreed they would stop in London to meet with the Guarantors and discuss the Ibedul's letter.

Before the Guarantors met with the Palauans on May 9, the Guarantors met

among themselves. They discussed whether they should respond to the Ibedul's letter and decided, having been instructed earlier to communicate with no one other than Task Force officials, that it was improper to become involved in an internal Palauan political matter but agreed that they should make it clear to the Palauan government by writing to the President of Palau that the Guarantors had not examined the revenue projections.

At the May 9 meeting with the Palauans, Mochrie first made a lengthy, detailed presentation showing that the Project would be self-financing and rejecting the contentions in the Ibedul's letter that the revenue projections were unrealistic. He openly invited the banks to compare his figures with the Ibedul's. The banks made no response, other than a statement by Hudson that "regardless of the Project's revenues, the Palauans must meet their obligations under the loan agreements."

After the meeting, the banks determined again that they should take further steps to make the Palauans aware of their position by "formally" advising its President that the banks' involvement in the loan was not based on whether the Project was self-financing. No such action was undertaken.

Shortly thereafter, President Remeliik may have sent a telex to Syrett in which he also referred to Palau's reliance on the banks' confirmation of the revenue projections. The telex, whose date is torn off but is marked "Rec'd FPO 5/10/83," states that the enactment of RPPL 1–54 "was presumably based on your analysis of the project and its viability." No witness authenticated the telex from the Palauan President to Syrett or testified that the document had been transmitted, or that Morgan Grenfell received the document. Syrett testified that he had not seen it. The telex was admitted into evidence for whatever it was worth, and all that is clearly established is that it was written and placed in Palau's files. It has no inherent authenticity and is further evidence of the

less than meticulous Palauan record keeping. It is possible that Palau never sent the telex. For one thing, unlike documents which were telexed by Palau, it contains no time of delivery entry at the bottom of the document. It refers to another document which never has been produced, *i.e.,* "This is a follow up of our earlier message sent yesterday...."

After the meeting, Oiterong and Salii traveled to New York. On May 17, 1983, Syrett and Hudson sent a telex to Oiterong at his hotel in New York in which they said that they had just learned of the suspension of RPPL 1–54. They asked Oiterong for information. On May 18, 1983, Oiterong and Salii went to Washington, D.C. with Mochrie. They and Willter met with DOI Assistant Secretary Pedro Sanjuan and Ambassador Fred Zeder. The Palauans and Mochrie asked that the United States reconsider guaranteeing the loans and reversing the High Commissioner's suspension of RPPL 1–54.

As a result of that reconsideration, on May 25, 1983, the U.S. State Department asked the U.S. Embassy in London to transmit a Note Verbale to the British government. The Note Verbale stated that the U.S. government fully supported Palau's efforts to improve its power-generating capability and that when the Compact became effective Palau would have in excess of $28 million dollars which could be used to service the loans. The Note Verbale further stated that, until such time as the Compact did become effective, Palau received U.S. aid which could be used to service the loans. Prior to June 8, 1983, IPSECO delivered a copy of the Note Verbale to the Guarantors.

On June 6, 1983, the DOI Inspector General advised Remeliik not to consummate the loan agreements or the construction contract because, among other things, a DOI review of revenue projections and Palau's other available revenue sources had caused DOI to conclude that Palau could not service the debt.[2]

2. Remeliik, most regrettably both for him, for Palau, and the purposes of this action, was assassinated after the events recounted so far. On

July 14, 1983, the DOI repeated its exit interview advice with respect to the Project. On September 2, President Remeliik replied, acknowl-

Remeliik elected not to relay this advice to Oiterong. In his later letter of September 2, 1983 to the Inspector General of DOI, drafted by Uherbelau, Remeliik stated that in light of the Note Verbale he had not relayed the DOI advice to Oiterong because it would have confused the matter. He also stated in that letter that the Palauan Congress and his administration had determined that the only avenue open to Palau was to borrow money on its public credit.

On June 8, 1983, Oiterong was told that the Guarantors had received the Note Verbale and he executed a Loan Agreement between (1) Palau and (2) Nat West and the ECGD for the financing of a 16MW power station and fuel storage facilities in Palau (the "Nat West Loan Agreement"). The Nat West Loan was in the amount of $24,-278,745.12. The Nat West Loan Agreement provided that Nat West, as principal, would lend the funds to Palau and Palau would repay Nat West. The role of ECGD was limited to situations where Nat West's obligations were terminated or were assigned to ECGD.

The Nat West Loan Agreement provided that Palau agreed to repay the loan in fourteen semi-annual installments of $1,734,196.08, and that the first such installment would become due and payable on September 2, 1985. Palau's liability to pay the semi-annual installments was not conditional upon IPSECO's performance pursuant to the Supply Contract and amendments thereto.

The Nat West Loan Agreement also provided that no advances would be made to Palau until such time as Palau had obtained all authorizations and fulfilled all conditions necessary to enable Palau to enter into the loan agreement and to make payment of all sums which would become due under the agreement. The Nat West Loan Agreement is governed by English law.

On June 8, 1983, Oiterong also executed a Loan Agreement between (1) Palau and (2) County Bank for the financing of the 16 MW power station and fuel storage facilities in Palau (the "County Bank Loan Agreement"). The County Bank Loan was in the amount of $8,200,000.00. The County Bank Loan agreement provided that disbursements would be paid directly to IPSECO and Nat West. Advances disbursed directly to IPSECO were to be repaid in ten equal semi-annual installments commencing on September 2, 1985. Advances disbursed directly to Nat West were to be repaid in three equal semi-annual installments commencing on March 2, 1985. Palau's liability to pay the semi-annual installments was not conditional upon IPSECO's performance pursuant to the Supply Contract.

The County Bank Loan Agreement also provided that County Bank was relying upon Palau's representations and warranties that the signatory had the full and unconditional authority to enter into the agreement and to pledge the full faith and credit of Palau for the due performance of its obligations; that the loan agreement was a valid and binding obligation; that the execution of the agreement and performance thereunder did not contravene the Palauan Constitution or any Palauan law; and Palau's obligations under the agreement were direct, general and unconditional obligations of Palau and ranked at least pari passu with all other present and future unsecured and unsubordinated obligations of Palau. The County Bank Loan Agreement also provided that Palau's representations and warranties would be deemed to be repeated by Palau on each interest due date. The County Bank Loan Agreement provided that Palau waived its sovereign immunity for purposes of any action in connection with the agreement. The County Bank Loan Agreement is governed by English law.

edging that this advice had been conveyed by telex to him on June 6. Neither the June 6 telex, nor the July 14, 1983 letter from Richard Mulberry, the Inspector General of DOI, was introduced in evidence, presumably not having

been located either in the DOI or Palau files. The content of the June 6 cable is inferred from the September 2, 1983 letter from Remeliik to Mulberry on the subject.

On June 8, 1983, Oiterong also executed a Coordination Agreement between (1) Palau and (2) the Guarantors and County Bank. The Coordination Agreement provided that Palau would establish and fund three separate accounts in New York at MGT. The accounts were to be known as the Project Account, the General Account and the Collateral Account.

Palau agreed to deposit the gross revenue of the Project (after deducting operational costs) in an account Call Account 000–54–027 (the "Project Account"); to place a portion of its external revenue in an account Call Account 000–54–025 (the "General Account") and to pay directly into the General Account on a semi-annual or more frequent basis, an amount not to be less than the full value of the next two installments of principal and interest due under each of the Loan Agreements and any sum due under the Recourse Agreement, such sums to be budgeted from time to time in the Palau National Unified Budget.

Palau agreed to maintain the General Account for so long as any of its obligations under the Nat West Loan Agreement, the County Bank Loan Agreement, the Coordination Agreement, or the Recourse Agreement remained to be performed. Palau also agreed to establish an account No. 10229 (the "Collateral Account") to secure the Guarantors.

Palau authorized and instructed MGT to withdraw from the Project Account (and if deposits in the Project Account were inadequate to withdraw from the General Account) and to deposit in the Collateral Account such amounts as were necessary to maintain a specified balance in the Collateral Account.

Palau agreed to deposit in the Collateral Account such amounts from any source whatsoever as were required to maintain the specified balance in the Collateral Account. Palau assigned and pledged to MGT (as Security Agent for the Guarantors) all amounts and interest thereon deposited in the Collateral Account as a continuing security for the obligation of Palau to the Guarantors.

The Coordination Agreement further provided that Palau represented and warranted that the signatory had full power and authority to execute and delivery the agreement; that the agreement was a valid and binding obligation; and that the execution of the agreement and performance thereunder did not contravene any Palauan law or conflict with the Palauan Constitution or the National Government Private Borrowing Authority Act of Palau.

In addition, the Coordination Agreement provided that Palau waived its sovereign immunity for purposes of any action in connection with the agreement. The Coordination Agreement is governed by New York law.

On June 8, 1983, Oiterong executed a Recourse Agreement between (1) Palau and (2) the Guarantors. The Recourse Agreement provided that the Guarantors would guarantee the Nat West Loan and the County Bank Loan against the counter-indemnity of Palau and the conditions of the Recourse Agreement. Pursuant to the Recourse Agreement, Palau agreed to indemnify the Guarantors, on demand, for any costs, expenses, losses or liabilities incurred in connection with the Guarantees. Palau agreed to so indemnify the Guarantors irrespective of whether the Guarantors made a properly due payment under the guarantees, and irrespective of any legal limitation or defense enjoyed by Palau.

Palau agreed to pay to Morgan Grenfell, as agent for the Guarantors, a per annum guarantee fee, a management fee of $10,000 per annum, all expenses of the agent and each Guarantor in connection with the enforcement of, or preservation of, any rights under the Recourse Agreement, interest on any monies owed by Palau to the Guarantors, and to reimburse Morgan Grenfell, as agent for the Guarantors, for all insurance premiums paid by the Guarantors.

The Recourse Agreement further provided that Palau represented and warranted that the signatory had full power and authority to enter into the agreement and to pledge the full faith and credit of Palau for the due performance by Palau of its obli-

gations under the agreement, that the agreement was valid and binding, and that the execution of the agreement and performance thereunder did not contravene the Palauan Constitution or any law to which Palau was subject. In addition, the Recourse Agreement provided that Palau waived its sovereign immunity for purposes of any action in connection with the agreement and provided that it was to be read in conjunction with the Coordination Agreement, and that Palau's obligations under the Recourse Agreement were secured under the Coordination Agreement. The Recourse Agreement is governed by English law.

By letter dated June 8, 1983, Uherbelau provided an opinion to County Bank and to Morgan Grenfell on behalf of the Guarantors stating that the obligations of the borrower [Palau] under the Eurodollar [County Bank Loan] Agreement and the ECGD [Nat West] Loan Agreement were direct, general and unconditional obligations of the borrower, and ranked at least pari passu with all other present and future unsecured and unsubordinated obligations and that the performance of all obligations set forth in the Loan, Coordination and Recourse Agreements fully complied with Palauan law.

The letter also stated that the choices of English law to govern the Eurodollar [County Bank Loan] Agreement, the ECGD [Nat West] Loan Agreement and the Recourse Agreement and of New York law to govern the Coordination Agreement were valid choices of law and that:

Hauro I. Remeliik, President of the Republic of Palau, has the power and the full and unconditional authority of the Borrower [Republic of Palau] to enter into the Agreements [County Loan, Nat West Loan, Coordination Agreement and Recourse Agreement] on behalf of the Borrower and to pledge the full faith and credit of the Borrower for the due performance by the Borrower of its obligations under the Agreements; the President has lawfully delegated to the Vice President, Alfonso Oiterong, full power and authority to execute and deliver the

Agreement and the Drawdown Notice on behalf of the Borrower.

On June 8, 1983, the Guarantors executed Guarantee Agreements with Nat West and County Bank guaranteeing the Palauan obligations under the Nat West Loan Agreement and County Bank Loan Agreement. The Nat West Loan also was guaranteed by ECGD. The ECGD Guarantee provided that, if the Guarantors did not honor their guarantee obligations to Nat West, ECGD would make payment of the Nat West Loan.

Pursuant to an Agency Agreement between Morgan Grenfell and the Guarantors, Morgan Grenfell undertook to act as the agent bank for the Guarantors. In that capacity, Morgan Grenfell obtained a policy of Contract Frustration Indemnity with Lloyd's Underwriters (Policy No. GT 3386700) in the amount of $34.8 million (the "Policy"). This Policy is the subject of pending litigation in the United Kingdom brought by the Guarantors to protect the Guarantors in the event Palau failed to maintain the proper amounts in the Collateral Account and Compact funds were not available. It has been suggested that Palau relied on the availability of the terms of the Policy for its benefit. No evidence preponderates to that effect. The Policy by its terms was to be held in confidence.

Palau began to draw on the loans on July 5, 1983. Payments on the County Bank Loan and the Nat West Loans were due for payment by Palau on March 4, 1985. Palau did not make the scheduled payments and the banks on March 6, 1985 noted the failure to make a required payment and on March 26, 1985, advised Palau that an event of default had occurred under clause 11.01 of the County Bank Loan Agreement.

On March 29, 1985, County Bank advised the Guarantors that they were required to pay as guarantors of the County Bank Loan the sum of $8,019,215.05, plus interest in the amount of $11,692.23.

On April 3, 1985, the Guarantors paid the full amount of the County Bank debt plus interest ($8,030,907.28).

On April 16, 1985, Nat West advised the Guarantors that they were required to pay

as guarantors of the Nat West Loan the sum of $25,734,143.76, plus interest thereon at the rate of 11.25% per annum, plus expenses in the amount of $1,728.45.

On April 18, 1985 the Guarantors paid the full amount of the Nat West debt plus interest and costs ($25,808,249.49).

As of March 5, 1985, Palau had a balance in the Collateral Account of $928,203.08. The Guarantors used these funds towards the payments made by the Guarantors to County Bank and Nat West. On April 4, and on April 9, 1985, the Guarantors made written demand upon Palau for payment of the $8,030,907,28 paid over to County Bank and further demanded costs of $65,612.74 and an indemnity of $1,605.00 and £15,570 (Pound Sterling). On April 18, 1985, the Guarantors made written demand upon Palau for payment of the $25,808,249.49 paid over to Nat West and further demanded costs of $103,501.83.

Meetings were held in New York on May 16, 1985, and the Guarantors advised Palau that as of that date it owed them $33,839,-156,77 as a result of amounts paid and incurred by the Plaintiffs as guarantors for Palau and in a letter of May 16, 1985, Palau, through its Vice President, stated:

> Palau does admit and indeed fully recognizes its obligations which, at the present time, we understand amounts to $33.8 million under the Recourse and Coordination Agreements, terms and conditions of which became operational when both the County Bank and International Westminster Bank, as lenders called your guarantees at the event of default occurring in March this year.

In meetings held in London on September 30, 1985, the Guarantors presented Palau with a draft Term Sheet detailing the amounts then owed by Palau to the Guarantors. The draft Term Sheet reflected that as of December 5, 1985, Palau owed the Guarantors $35,064,493.42. The Palauans agreed to the amount set forth in the draft Term Sheet.

The Project initially encompassed a power generating station with five generators. Because of the relocation from Koror to Babeldoab because of the Ibedul's opposition, Palau elected to cancel one of the five generators and to utilize those funds in connection with the relocation and transmission lines had to be constructed to carry the power from the Plant site to Koror.

Although the Plant now is operational, the construction of the transmission lines was delayed including those to serve Babelthaup. The Palauan government receives power from the station but does not pay for it. Houses and two major industries have not yet been hooked up. The tank farm is operational but no purchasers of its fuel have entered any contracts for fuel. The Palauans do not know how to operate the tank farm and IPSECO has not instructed them in such use. IPSECO is defunct.

As of April 10, 1988, Palau owed to the Guarantors $44,483,533 and £168,386. These sums include $8,030,907, owed on the County Bank Loan Agreement, $25,808,249 owed on the Nat West Loan Agreement, $8,637,724 in capitalized interest, an insurance premium in he amount of $784,523, an agency fe of $30,000 and interest on the insurance premiums and on the agency fee of $170,107 together with legal and other expenses of $1,022,023 and £168,386.

The English law was submitted in the form of an unchallenged Declaration of English Law by Freshfields. Its summary conclusions are set forth as follows:

(1) *Misrepresentation*

A misrepresentation of present fact may be actionable if it to some extent induces another party to enter into a contract with the representor. A statement as to future facts can in some circumstances be treated as a representation of present fact; this will be the case where the representor has superior knowledge to the representee and it is reasonable for the representee to rely on the representation. Although a party to a contract is generally entitled tacitly to acquiesce in the mistaken belief of another, this will not be the case if the circumstances are such that the silence contributes to a misrepresentation by conduct, or a duty of disclosure arises because the

parties are in a sufficient confidential or fiduciary relationship.

(2) *Fraudulent Misrepresentation*

A statement will be a fraudulent misrepresentation if the maker knew it was false or if he was consciously indifferent whether or not it was false. Negligence alone, however, is not sufficient to render a misrepresentation fraudulent.

(3) *Mistake*

A contract will be void at common law if one party to the contract ("A") knew that the other ("B") was contracting under a mistake as to some fact which was sufficiently fundamental that had B known the true position, he would not have entered into the contract. By contrast, an error of motive on B's part will not render a contract void for unilateral mistake.

(4) *Rectification*

Rectification will be available as a remedy in equity in cases where a contract would be void at common law for unilateral mistake. However, the remedy will also be available in certain other cases. It is in the Court's discretion whether or not to award the remedy in any particular case.

(5) *Non est factum*

The plea of non est factum may in certain circumstances be available to a signatory of full capacity provided, first, that the difference between the contract he thought he was singing and the contract he actually signed is "fundamental" and, secondly, that he was not negligent in signing the document. The question what the signatory thought he was signing depends on a subject evaluation of his intention. It seems likely that the plea is available even if the other party did not know of the mistake and was not in any way responsible for it.

(6) *Undue Influence*

If the relationship between two parties to a contract is such as to raise a presumption that undue influence may arise the onus is on the party in a dominant position to prove there was no such influence exercised. If there is no presumption raised then the party seeking to impeach the transaction must demonstrate that undue influence was exercised e.g. by the way in which the negotiations were conducted. Although the relationship between a banker and its customer does not itself raise the presumption, this is not the case where a banker does more than merely explain the general nature of the documents the customer is about to sign and advises "on more general matters germane to the wisdom of the transaction." Moreover the transaction must be manifestly disadvantageous to the party influenced.

## CONCLUSIONS OF LAW

### The Guarantors Have Established a Prima Facie Case

The existence of the default by Palau, the payments under the guarantees made by the banks, the timely written demands made by the banks, and the principal, interest, and costs as to which the banks are entitled to the entry of judgment all have been proven as set forth in the facts found above.

The Guarantors have established that by virtue of their performance under the loan guarantees, they are entitled pursuant to the Recourse Agreement to recover from Palau the amounts paid by the Guarantors, plus interest, costs and legal fees. These sums included $8,030,907 paid over to County Bank; $25,808,249 paid over to Nat West; $8,637,724 in capitalized interest; an insurance premium in the amount of $784,523; an agency fee of $30,000; interest on the insurance premiums and on the agency fee of $170,107; and legal and other expenses of $1,022,023 and £168,386. Palau has sought to defeat this prima facie claim by asserting its affirmative defenses based on sovereign immunity, fraud, misrepresentation and mistake.

### The Waiver of Sovereign Immunity

Despite the prior opinions rendered in this action, Palau has appropriately renewed its motion to dismiss on the ground of sovereign immunity, urging that the

facts have demonstrated that Palau did not waive its sovereign immunity. Among other facts relied upon was the suspension by the High Commissioner on May 5, 1983 of the waiver of sovereign immunity contained in RPPL 1–54.

This court, in its opinion dated January 29, 1988 dealt with the Joint Resolution of Congress enacted as Public Law No. 99–658, 48 U.S.C. § 1681 note (Supp.1987) ("Joint Resolution"), which approved the Compact of Free Association between Palau and the United States and provided for procedures to implement it. Section 104(e) of that act provided in part, "The provisions of section 174(a) of the compact shall apply with respect to any action based on a contract or debt related to any electrical generating plant or related facilities entered into or incurred by Palau prior to the date of enactment of this joint resolution." Section 174(a) reads in relevant part, "The Government of Palau shall be immune from the jurisdiction of the courts of the United States."

Congressional consideration of the Compact and the issues considered in the January 29, 1988 opinion still continues. A resolution has been introduced into the Senate which authorizes the Compact's entry into force. Two resolutions have been introduced into the House, one of which authorized the Compact's entry into force, but amends § 104(e) of the Joint Resolution by deleting the part quoted above which applied § 174(a) to this suit. The other House resolution disapproves proposed agreements which have been negotiated pursuant to the Joint Resolution.

The January 29 opinion held that § 104(e) became effective upon passage of the Joint Resolution, that the sovereign immunity created by § 104(e) is waivable, and that Palau had waived its sovereign immunity when it signed the loan agreements with plaintiffs in June 1983 which contained a clause waiving Palau's sovereign immunity. The opinion further stated that Congress' apparent regranting of sovereign immunity to Palau in this case by passage of the Joint Resolution would abrogate the banks' "private contractual rights, rights which were assured by the executive branch of the government, leaving an uncertain path to the enforcement of those rights" and would amount to a Congressional taking of property without just compensation and without due process of law in violation of the Fifth Amendment. "[S]ince the legislation leaves the Banks without access to any tribunal where they can be assured of the enforcement of their contract rights, the legislation must fail."

The facts found above establish that after President Remeliik originally signed the loan documents in Palau in February 1983, the Ibedul brought a suit challenging the President's authority under Palauan law to enter into the agreements. The ECGD, with the concurrence of the banks, demanded that Palau enact corrective legislation to specifically authorize the President to enter into the Project. The legislation drafted by ECGD's lawyers included a provision expressly authorizing the President to waive the sovereign immunity of Palau. The OEK passed the legislation, after making substantial amendments to the ECGD's bill, as RPPL 1–54, and the President signed it. It contained a provision which stated that the President was granted authority "to waive the immunity of the Republic of Palau from suit, attachment or execution to such extent as the President shall determine consistent with the constitution."

As required by law, Palau submitted RPPL 1–54 to the High Commissioner of the United States Trust Territories for review. On May 5, 1983, the High Commissioner suspended the waiver. The grounds for the High Commissioner's suspension was that waiver of Palau's immunity would expose United States aid funds to diversion from the purposes for which they were granted. The suspension by the High Commissioner had the legal effect of rendering that section of the legislation "null and void." The waiver of sovereign immunity provision was retained in the loan documents, according to Hudson, because the banks believed that if the United States trusteeship over Palau terminated in the future, "the suspension would be lifted so that [the] wording would become effective

just as though no suspension had taken place."

Hudson further testified that the Guarantors understood that Palau would not have sovereign immunity in United States courts in any event under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, because the loan agreements would fall under the "commercial activity" exception to sovereign immunity.

Under Palau law RPPL 1–20, the President of Palau had authority to waive Palau's sovereign immunity and to pledge Palau's full faith and credit for purposes of private borrowing. *Morgan Guaranty v. Palau*, 657 F.Supp. 1475, 1480 (S.D.N.Y. 1987). The Uherbelau opinion letter of March 17, 1983, was followed by another and later opinion letter dated June 8, 1983, which stated that the Vice President of Palau had the authority to waive Palau's sovereign immunity and pledge its full faith and credit pursuant to RPPL 1–20 and RPPL 1–54.

RPPL 1–54, the law enacted at the insistence of the ECGD was passed to enable Palau to deal with a governmental entity such as ECGD. Regardless of the effect of RPPL 1–54 and its suspension with respect to government to government transactions, Palau and the Guarantors agreed that Palau pledged its full faith and credit, waived its sovereign immunity, and engaged in commercial activity in entering the loan agreements. Palau also agreed that its defenses in courts of New York would be governed by the 1976 Foreign Sovereign Immunities Act.

The Recourse Agreement provides in Paragraph 6(b) that Palau has authority to pledge its full faith and credit as security for the loan. It also provides in Paragraph 6(i)(ii) that the actions of Palau constitute commercial activity. Furthermore, the Recourse Agreement states that it is the intention of the parties that in any action in the State of New York "the waiver of sovereign immunity ... [is] made in conformity and shall be governed by the Foreign Sovereign Immunities Act of 1976 of the United States of America."

■ Therefore, on June 8, 1983, the Guarantors had a private contractual right to enforce the Recourse Agreement in the State of New York pursuant to the 1976 Foreign Sovereign Immunities Act. 28 U.S.C. §§ 1602 *et seq.* Furthermore, the FSIA provides that commercial activity constitutes a waiver by a sovereign of its immunity. 28 U.S.C. § 1605(a)(2). Therefore, irrespective of RPPL 1–54, Palau by contract had waived its right to assert sovereign immunity in the State of New York. The May 3 act of suspension regarding waiver of sovereign immunity with respect to government to government borrowing authority in order to protect U.S. funds did not serve to nullify the obligations undertaken by Palau under the Recourse Agreement.

*The Applicable Law*

Since this case arose under the FSIA and is within the "federal question" jurisdiction of this court, requiring a federal common law choice of law analysis is required. *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 121 (2d Cir.1984); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 794–95 (2d Cir.1980), *cert. denied, sub nom. Corporacion Venezolana de Fomento v. Merban Corp.*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981) ("CVF").

■ The Guarantors have sued to recover moneys from Palau owed under the Recourse Agreement and the Co-ordination Agreement. Each of these Agreements have choice of law clauses. The Recourse Agreement clause states in § 11.01, "This Agreement shall be governed by and construed in accordance with English law." The Coordination Agreement provides in § 6.1, "This Agreement shall be governed by and construed in accordance with the laws of the State of New York." Normally, these choice of law clauses will be respected in actions relating to the contract, if there is a reasonable basis for the choice. Restatement (Second) of Conflict of Laws § 187 (1971).

■ Palau urges that irrespective of the choice of law provision in the Recourse

Agreement and the Coordination Agreement, its affirmative defenses of fraud, misrepresentation and undue influence render the choice of law clause ineffective and that these issues of fraud and mistake should be decided under Palauan law which at this moment is unwritten in the absence of statute or case law. The Palauan National Code provides that in such a circumstance the Restatement of Law of the United States shall apply. However, Palau has not established that the choice of law clause itself was consented to as a result of fraud or misrepresentation. Restatement (Second) of Conflicts §§ 187, 201 (1971).

Palau has urged the application of the principle of "depecage" first enunciated by the Court of Appeals in *CVF, supra,* which applied rules of one of the legal systems to regulate certain issues arising from a transaction while the rules of another system regulate other issues. *CVF, supra,* at 794. In *CVF* the principle was applied to separate causes of action (e.g, the contract cause of action and the fraud committed in Venezuela). No authority has been cited for applying different laws to a cause of action and the affirmative defenses to that cause of action.

In addition, both of the cases cited by Palau, *CVF, supra,* and *Aaron Ferer & Sons Ltd.., supra,* applying depecage, examined where the alleged fraudulent acts occurred and the residence of the parties involved to determine what law applied to the issue of fraud.

The defenses in this case involve allegations that two English entities (one a nonparty, IPSECO) defrauded the Palauan Task Force by giving false projections of project revenue and misrepresenting the contents of the loan documents. The fraudulent representations allegedly occurred at the following places: (1) Guam, in September, 1982; (2) Athenaeum meeting, in London, November, 1982; (3) the first signing in Palau, February, 1983; (4) IPSECO testimony before the OEK in Palau, April, 1983; (5) final meeting in London on May 9, 1983; and (6) the signing in London, June 8, 1983.

The two events in Palau did not result in the agreements at issue, and the contact with Palau is therefore less significant for choice of law purposes. The second contact in Palau occurred when Mochrie testified before the OEK, but the Guarantors were not present at this testimony. IPSECO was not an agent of the Guarantors as more fully set forth below. The most significant action or lack of it by the Guarantors took place in London after the Ibedul's letter and after Mochrie's statements at the May 9 London meeting.

The lending Banks are English entities, and they and Palau have agreed that the alleged fraud was committed in English to induce Palau to enter into the agreements. Furthermore, the adequacy of the power plant does not enter into an analysis of the law that applies to Palau's defenses to the agreements. The Guarantors did not construct the power plant which was the subject of the IPSECO/Palau Agreement.

The United Kingdom has the most significant relationship with the alleged fraud and misrepresentation and has a substantial interest in preventing fraud by banks operating within its jurisdiction. *Aaron Ferer & Sons, Ltd., supra,* at 121. Even under the principle of decepage, English law applies to the affirmative defenses as well as the validity and interpretation of the contract.

The only contact New York had with the transaction is that one of the five plaintiffs is a New York resident and is the security agent for the monies paid into the accounts set up under the Coordination Agreement. Furthermore, payments under the Coordination Agreement were to be made into accounts in New York. However, the Recourse Agreement, not the Coordination Agreement, is the basis for this litigation. Finally, there are no allegations that any fraudulent acts occurred in New York. Thus, New York law does not apply to any issues in this case.

*The Absence of an Element of the Defense of Fraudulent Misrepresentation*

■ As found above, Mochrie affirmatively stated to the Palauans at the critical London meeting on May 9, 1983 that the

Guarantors agreed with his projections which showed the Project would be self-financing. The statement was made to counter the position taken by the Ibedul. It was not true, and the Guarantors failed to state the truth, namely, that at best they had no opinion and that at worst they did not agree and were not relying on the Project's prospects but on the recourse to the Palauan funds, whether United States aid funds or Compact funds. Perhaps even more misleading under the circumstances was Hudson's statement that regardless of the Projections, the obligations under the Agreements would have to be met without any contradiction of Mochrie's assertion that the Guarantors agreed with his projections. Despite their decisions to address the issue of the Mochrie projections squarely, directly and formally, the Guarantors did not do, conscious as they were of the sensitivity of the political situation in Palau.

The Palauans were prepared to go forward, to obtain a power plant, and they heard what they wished to hear—that the problems of financing could be solved through the Project's revenues. The Palauan delegation chose to believe Mochrie's representation that the banks agreed with his projections, undeterred by the silence of the Guarantors.

In New York, a party, even if silent, can be liable for misrepresentation when certain other circumstances are present. Misrepresentations can be made by the conduct or physical actions of a party. *Lukowsky v. Shalit*, 110 A.D.2d 563, 487 N.Y. S.2d 781, 785 (1st Dept.1985). If a special relationship exists between the party and another party, the misrepresentation by the other party can be ascribed to the silent party.

In Palau, the Restatement (Second) of Torts § 551(e) provides a similar standard for liability for non-disclosure. "One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated ... facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the

other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Also, Restatement (Second) of Contracts § 161(b), which this court has previously cited in its opinion, states that a person's:

non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist in the following cases only: ... where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

The Restatement (Second) of Contracts contains a similar rule that a contract may be voidable by a misrepresentation made by a third party under certain circumstances:

If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction *in good faith and without reason to know of the misrepresentation* either gives value or relies materially on the transaction.

Restatement (Second) of Contracts § 164(2) (emphasis added).

Under British law also, "a misrepresentation may be made by silence, when either the representee, or a third person in his presence, or to his knowledge, states something false which indicate to the representor that the representee either is being, or will be, misled, unless the necessary correction is made." Bower & Turner, *Actionable Misrepresentation*, Third Edition, at 101 (1974). The issue of a misrepresentation by a third party inducing a contract appears in *Bradford Third Equitable Benefit Building Society v. Borders*, (1941) 2 All E.R. 205. There, a house builder made false misrepresentation to a purchaser that the houses were particularly well built, and

that an unnamed building society (loan company) was prepared to advance 95% of the purchase price of the houses. The plaintiff building society made no representations directly to the purchaser, who entered into a mortgage with it. The purchaser brought a claim against the building society for the fraudulent representations made by the builder.

The Court of Appeals held that the building society "associated themselves with the fraud, and are, therefore, responsible for it, for they had knowledge of the misrepresentations, and of their falsity, and they must have known that it was under the influence and through the inducement of the false representations that the [buyer] ... was proceeding to complete those contracts [with the building society]." *Id.* at 210. The House of Lords reversed the holding, but on the basis of factual issues, finding there was no evidence that the building society knew the representations by the builder to be false or that the building society knew the representations were even made to the buyer. *Id.* at 214–15, 217, 223. According to Palau, the House of Lords left standing the conclusion of the Court of Appeals conclusion that if the building society (i) had knowledge that the builder was making false representations about the building society to other parties, and (ii) that the parties were being induced as a result of these false representations into entering into contracts with the building society (which are the facts of the present case), then the building society would have become directly liable as participants in the fraud of the builder.

Once a party breaks his silence on a subject, in this case, the Guarantors' statement relative to revenues made after the Mochrie projections, he has a duty to tell the truth about the subject. He cannot tell half-truths or only partially state the facts so as to mislead another party. For example, the Restatement (Second) of Torts § 551(2)(b) provides, "One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated ... matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading." *See also Peerless Mills, Inc. v. American Tel. & Tel. Co.*, 527 F.2d 445, 449 (2d Cir.1975); *Gray v. Richmond Bicycle Co.*, 167 N.Y. 348, 60 N.E. 663 (1901). A party's concealment of facts to create a false impression is actionable as fraud. *Donovan v. Aeolian Co.*, 270 N.Y. 267, 271, 200 N.E. 815 (1936); Restatement (Second) of Contracts § 160 (1981). As the New York Court of Appeals has stated, "While the defendant was not legally bound to speak at all, it was bound, if it did speak, to take no advantage, either by misrepresentation or concealment. If it broke silence, the circumstances required the utmost candor in every statement." *Gray*, 167 N.Y. at 356, 60 N.E. 663.

Finally, a duty of full disclosure, arises when parties are in a fiduciary or confidential relationship. While certain relationships are considered per se fiduciary, fiduciary relationships exist in any case in which influence has been acquired and abused or confidence has been reposed and betrayed. *Mechigian v. Art Capital Corp.*, 612 F.Supp. 1421, 1431 (S.D.N.Y. 1985); Restatement (Second) of Contracts § 177 (1981). The House of Lords recently recognized that a confidential relation may exist in the context of a banking transaction where one party has a dominating influence over the other. *National Westminster Bank v. Morgan*, (1985) 1 All E.R. Here, given the nature of the parties, their roles, and relative sophistication, such a fiduciary duty existed to speak after Mochrie's representations.

However, the ultimate executive authority was the President of Palau. It was he who had appointed the Task Force, and it was to him that the DOI reported its conclusion on June 6 that the Project was fiscally unsound, as found above. As the President later conceded, despite this advice he determined not to delay the execution of the agreements. Therefore, Palau cannot thereafter establish that it relied on the Mochrie projections, the substance of which had been directly challenged. The words of President Remeliik establish that prior to the June 6 telex Palau relied on the

banks' implicit endorsement of Mochrie's projections. There was no such reliance after the telex, and President Remeliik so conceded. It is the element of reliance which is the missing element in Palau's affirmative defense.

A claim of negligent misrepresentation is established by a showing of a misrepresentation as to a material fact, reliance on the misrepresentation by the representee, knowledge of such reliance by the representor and injury. *Seneca Wire and Manufacturing Co. v. A.B. Leach & Co.*, 247 N.Y. 1, 7–8, 159 N.E. 700 (1928). Under the Misrepresentation Act of 1967 in Great Britain, the representor has the burden of proving he was not negligent.

The elements of a claim for fraudulent inducement of contract are a misrepresentation of a material fact, made with knowledge that it is false and with the intent that the other party act upon it, which is reasonably relied upon by the other party and as a result of which the party suffers injury. *Bradford Third Equitable Benefit Building Society v. Borders* (1941) 2 All E.R. 205; *DiRose v. PK Management Corp.*, 691 F.2d 628, 630 (2d Cir.1982), *cert. denied*, 461 U.S. 915, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983). It is the element of reliance which is fatally missing in Palau's affirmative defense.

*The Absence of Agency*

■ Palau seeks to tax the Guarantors with an agency relationship between them and IPSECO and thereby to take advantage of IPSECO's allegedly false projections. Although IPSECO repeatedly made statements regarding the self-financing nature of the Project and regarding the banks' own confirmation of the viability of the Project, no evidence has been adduced to establish that a principal/agent relationship existed between IPSECO and the banks.

Hudson swore that "IPSECO were reluctant for us to over-emphasize to the Palauans the importance of the Compact funds and U.S. aid as what we regarded as the main source of funds for servicing the debt, as this weakened their contention that the revenue from the Project (espe-cially the bunkering facility) would be sufficient in time for this purpose," and stated he did not believe it proper for Morgan Grenfell to contradict IPSECO in its representations about revenue projections or other matters in the presence of the Palauans because IPSECO was a "client" of Morgan Grenfell and one's clients should not be contradicted.

Although under its agreement with IPSECO on the Palau Project Morgan Grenfell was to receive "fees" for financing the Project, and Morgan Grenfell on an occasion referred to IPSECO as its "client" and also was working together with IPSECO on financings in the Marshall Islands, such facts do not constitute an agency and Palau has cited no authority to that effect.

Although no actual joint venture agreement or agency existed between the Guarantors and IPSECO under law, Palau urges that the appearance of one certainly was created in fact, claiming that English and American law recognize the creation of an agency by estoppel. *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1, 11 (2d Cir.1978). "Agency by estoppel" arises when "the party charged as principal intentionally or carelessly causes the belief that the putative agent is authorized to bind that party" or "knowing of such belief and that other might change their positions because of it, he did not take reasonable steps to notify them of the facts." *Karavos Compania, Naviera S.A.*, 588 F.2d at 11 (quoting Restatement (Second) of Agency § 8B(1) (1958)); *Cullen v. BMW of North America, Inc.*, 531 F.Supp. 555, 559–60 (E.D.N.Y.), *rev'd on other grounds*, 691 F.2d 1097 (2d Cir.1982), *cert. denied*, 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983); *Freeman v. Lockyer v. Buckhurst Park Properties (Mangal) Ltd.*, (1964) 1 All E.R. 630, 645. The third party's reliance on the apparent authority of the purported agent must be reasonable. *Karavod Compania Naviera S.A.*, 588 F.2d at 11.

However, the nature of the relationship of all the parties was spelled out in great detail in specific agreements. None of those agreements established an agency

relationship between IPSECO and the banks and the documents preclude estoppel.

*The Absence of of Mistake*

■ It is a principle of English law that where a person of full age signs a document he is strictly bound by its terms whether or not he had read the document. *L'Estrange v. Graucob,* 1934 2 KB 394. The same principle applies under New York law. *See Gaskin v. Stum Handel,* 390 F.Supp. 361, 366 (S.D.N.Y.1975).

In this case there is no doubt that the Palauans understood the terms of the agreements. Willter, the leader of Palau's delegation at the Athenaeum meeting in November of 1982 testified that he understood the documents and that he understood the operation of the Project, General and Collateral Accounts as well as the guarantees. He also understood that in the event of a default by Palau the entire debt would accelerate and become due. He further stated that he and the delegation members had reviewed the documents line by line and that he had initialed each page.

After the November meeting in London, the documents remained essentially unchanged. However, Willter said when he returned to Palau with the documents he turned them over to the Acting Attorney General with the instruction to make any legal changes necessary. Furthermore a legal task force reviewed the documents in Palau and one member of the task force pointed out that the security provisions were particularly strict. The Acting Attorney General defended a lawsuit challenging the project because it was too expensive and exposed the national treasury of Palau in the event of default. Finally, the Acting Attorney General issued three opinion letters attesting to the scope of the agreements including Palau's pledging of its full faith and credit.

The only mistake which could be claimed is that the agreements called for the Project to be self-financing. The language does not so provide. To establish mistake, the Palauans must show the documents failed to reflect the intentions of the parties and (i) the banks knew of the failure, (ii) the banks knew the failure to be the mistake of the Palauans, (iii) the banks failed to advise the Palauans of the mistake and the (iv) inaccuracy of the documents operated to the detriment of Palau. *Thomas Bates Ltd. v. Wyndham's,* 1981 WLR 505. Palau has failed to establish these elements.

Shortly before executing the documents, Palau's Attorney General described to the High Commissioner of the Trust Territory and her Attorney General that if the project revenues were insufficient to repay the debt Palau would make up the difference from local revenues. Willter stated to the Palauan Congress, the OEK, that should the administration not have sufficient revenues from the project during the first three years it would be asking the OEK to make up the difference to fund the debt. Furthermore Palau's Vice President, as well as its Ambassador for Compact negotiations, went to the DOI to obtain a Note Verbale which was sent to the English government stating that U.S. foreign aid and Compact monies could be used by Palau to repay the debt. Palau's Vice President testified at trial that he understood the Note Verbale had persuaded the banks to go forward with the transaction. Against this factual background Palau has failed to establish any of the elements of mistake.

*Conclusion*

Since the Guarantors have established their prima facie case and Palau has failed to establish its affirmative defense of sovereign immunity, misrepresentation, and mistake, the relief sought in the complaint will be granted. Based on the findings and conclusions set forth above, judgment will be entered on behalf of the Guarantors with costs and disbursements. Settle judgment on notice.

It is so ordered.